ROETHER, Appellant, vs. ROETHER and another,
Respondents.

*December 8, 1922—March 6, 1923.*

*Marriage: Of persons under guardianship: Termination of guard-
ianship: Nature of contract: Test of mental capacity to
marry: Evidence: Sufficiency: Statutes in conflict: Which
governs.*

1. Where the legislature has fully covered a subject in one place,
   an apparent exception or modification under a different sub-
   ject does not change the substance of the law as declared
   where fully treated.
2. Under sec. 3970, Stats., when a female under guardianship
   marries, the authority of the guardian as to her custody and
   education ceases.
3. A marriage contract is a civil contract, but its essence is to
   define a status in society rather than to regulate control over
   property.
4. Sec. 3979, Stats., providing that upon an application for the
   appointment of a guardian for an alleged incompetent a
   copy of the petition and order for notice may be filed in the
   office of the register of deeds, and that if a guardian is ap-
   pointed all contracts of incompetents made after the filing
   of the order, except for necessaries, shall be void, does not
   include a contract of marriage.
5. A person is not incapacitated from marrying by reason of the
   fact that he is under guardianship.
6. The test of mental capacity to enter into a marriage contract
   is not whether the parties are of sufficient mentality to measure
   up to the responsibility incurred by bringing offspring into the
   world, but the true test is whether there is understanding and
   mental capacity to realize what is then being done and con-
   senting thereto.
7. The fact that defendant had been adjudged mentally incom-
   petent to manage his estate created a presumption that the
   condition once shown to have existed still exists, but slight
   proof to the contrary will rebut the presumption; and the
   evidence in this case is *held* to show that defendant had
   mental capacity to marry.

APPEAL from a judgment of the county court of Iowa
county: ALDRO JENKS, Judge. *Reversed.*

This is an action to affirm a marriage entered into in the

state of Illinois between the parties on the 10th day of January, 1922. At that time the defendant, who had been married June 15, 1920, and become a widower by the death of his first wife in January, 1921, was about sixty-one years of age, and the plaintiff was a single woman about thirty years of age. In 1916 the defendant was adjudged an incompetent and a guardian of his person and estate was appointed. Such guardianship existed at the time of the marriage of the plaintiff to the defendant. The defendant did not answer the complaint, but his guardian, *A. F. Bishop, Jr.,* did, denying the validity of the marriage, and put in a counterclaim asking the annulment thereof.

The county court found "that at the time of said marriage there was on the part of *Nicholas J. Roether* such a want of understanding as to render him incapable of assenting to marriage and that he did not possess sufficient intelligence to understand the nature of such contract." It further found "that at the time of said marriage said *Nicholas J. Roether* was insane within the meaning and purport of sec. 2330 of our Statutes." The county court was also of the opinion that sec. 3979 of our Statutes invalidated the contract of marriage. In conformity with such view and the findings made it entered a judgment declaring the marriage wholly null and void. The plaintiff appealed.

*Thomas M. Priestley* of Mineral Point, for the appellant.
*Calvert Spensley* of Mineral Point, for the respondents.

The following opinion was filed January 9, 1923:

Vinje, C. J. The question of law presented is whether or not sec. 3979 of our Statutes rendered the marriage void. It reads:

"After the order for notice, as provided in sections 3976 and 3978, has been issued the petitioner may cause a copy of the petition, with a copy of the order for such notice, to be filed and recorded in the office of the register of deeds for the county; and if a guardian shall be appointed

upon such application all contracts, except for necessaries. at reasonable prices, and all gifts, sales, and transfers of real or personal estate made by such insane or incompetent person or spendthrift, after the filing of a copy of such petition and order as aforesaid and before the termination of the guardianship, shall be void."

The learned county judge came to the conclusion that it did because it said *all* contracts and that to make an exception was judicial legislation; that the legislature could prohibit spendthrifts, gamblers, and drunkards under guardianship from marrying, and that by the enactment of secs. 3978 and 3979 it has done so; that such legislation is the establishment of a public policy which the courts should enforce.

It will be conceded for the purpose of this case that it is within the legislative field to so restrict marriage. But the question remains, Has it been so restricted? It is a familiar rule of statutory construction that where the legislature has fully covered a subject in one place, an apparent exception or modification under a different subject does not change the substance of the law as declared where fully treated. Our legislature has recognized this rule by enacting that

. "If the provisions of different chapters of these statutes conflict with or contravene each other the provisions of each chapter shall prevail as to all matters and questions growing out of the subject matter of such chapter." Sub. (14), sec. 4972.

In our marriage laws there is no prohibition of marriage because a party may be under guardianship. Indeed, our statutes, sec. 3970, provide that when a female under guardianship marries, the authority of the guardian as to her custody and education ceases. At common law persons under guardianship could marry, and the general rule was that the marriage of a male ward terminated the guardianship of his person but not of his estate, while the marriage of a female ward to an adult person terminated the guard-

ianship entirely.    28 Corp. Jur. 1097; Woerner, American
Law of Guardianship, 334 *et seq.; Brick's Estate,* 15 Abb.
Pr. 12.    In view of this state of the common law the query
arises, Did our legislature intend to prohibit the marriage
of wards coming under sec. 3979?    It is true a marriage
contract is a civil contract, but its essence is to define a
status in society rather than to regulate control over prop-
erty.    In sec. 3979 the legislature was dealing with the
latter subject.    In *Cowan v. Bean,* 159 Wis. 67, 149 N. W.
745, this court had occasion to define the scope and purpose
of the statute, and it was said:

"Its object and purpose seems to be to prevent an incom-
petent from disposing of his property so as to place it out
of his control and beyond his recall during the pendency of
the guardianship proceedings."    Page 82.

It was there held that a gift by will did not come under
the provisions of sec. 3979.    Neither do we think that a
marriage contract comes within its provisions.    The con-
tracts, gifts, sales, and transfers there mentioned all relate
to property rights or obligations, and the doctrine of *ejus-
dem generis* applies.    It excludes a contract whose prime
purpose is to define the personal status of the parties in so-
ciety, and especially must this be so where the legislature
has fully treated the restrictions upon marriage in another
chapter, where there is no such restriction as sec. 3979 is
claimed to impose.    We therefore reach the conclusion that
defendant was not incapacitated from marrying by reason
of the fact that he was under guardianship.    For a case
bearing upon this subject under somewhat similar statutes
see *Payne v. Burdette,* 84 Mo. App. 332.

The findings of the trial judge to the effect that defendant
was insane within the meaning of the term as used in the
marriage statutes, sub. 1, sec. 2330, we think are not sup-
ported by the evidence.    Sec. 2328, Stats., provides that
"Marriage, so far as its validity in law is concerned, is a

civil contract, to which the consent of the parties capable in law of contracting is essential;" and it was held in *Hempel v. Hempel,* 174 Wis. 332, 181 N. W. 749, 183 N. W. 258, that the test of mental capacity was not whether the parties were of sufficient mentality to measure up to the responsibilities incurred by bringing offspring into the world, but the true test was whether there was understanding and mental capacity sufficient to realize what was then being done and consenting thereto. Page 339. Tested by this rule, for reasons to be hereinafter stated the defendant was mentally capable of entering into a marriage contract. The trial judge also stressed the fact that in the guardianship proceedings in 1916 the defendant was found mentally incompetent to manage his estate, and that such a condition having once been shown it was presumed to continue to exist. It is true that a condition once shown to have existed is *prima facie* presumed to exist, but slight proof to the contrary will rebut the presumption. The finding of mental incompetency to manage his estate in 1916 can remain unchallenged for two reasons, stated in *Guardianship of Farr,* 169 Wis. 451, 453 (171 N. W. 951), as follows:

"First, because 'sanity' and 'competency to manage an estate' are not synonymous terms. A man may be sane in a sense that it is not necessary to incarcerate him in an asylum, and yet be incompetent to manage an estate, even though he be not a spendthrift or a drunkard. And second, because a condition of sanity or competency to manage an estate is not a permanent, unchangeable condition. A man may be sane or competent at one time and be insane or incompetent at a future time."

Applying these rules of law to the present case, we find that the inquiry narrows down to the establishment of the fact whether or not on January 10, 1922, when the marriage with plaintiff took place, the defendant had mental capacity sufficient to understand the nature of the contract and consent thereto. On behalf of the defense two witnesses were

sworn. One, Albert Roether, a brother fifty-two years of age, said, "I can't say that my brother is insane. I don't think he is an idiot, I don't think he is an imbecile." The other witness, *A. F. Bishop, Jr.,* the guardian, who put in the answer and prosecuted the defense, testified: "I suppose he would know what he was doing when he got married on January 10, 1922." This is all the direct evidence offered by the defense on the subject of sanity. There was considerable evidence on the subject of an improvident sale of a patent by defendant in 1916 and the signing of notes for the purchase of some wild land in Michigan, but it bears so remotely on the question of sanity here at issue that we do not deem it necessary to go into it. The only other evidence relied upon by the defense are certain love letters written by defendant to plaintiff during their brief courtship. They are seven in number and cover about seven printed pages. They can be most tersely and accurately characterized, both as to spelling and humor, by calling them an attenuated reproduction of Josh Billings. In ardor perhaps they equal him, but that does not necessarily prove insanity—at least not different from that of the average man under similar circumstances.

On behalf of plaintiff, in addition to her testimony that her husband was sane, we have that of Dr. W. M. Gratiot, who testified:

"I am a physician practicing in Mineral Point, Wisconsin. Am acquainted with *Nicholas Roether* and have known him about eighteen years, during which time I have seen him frequently and talked with him. I attended his first wife during her last illness and during that time he betrayed the natural concern that a normal husband would betray. He was attentive to his wife. I think I attended her about two weeks; only at her house once. She was at the hospital here at Dodgeville. He was over there part of the time and appeared to be solicitous about his wife's condition. During that time I did not see anything about him that would indicate that he was insane, an imbecile, or an idiot. I have not

talked with him very often in Mineral Point, but in the conversations that I have had with him there was, nothing that would lead me to think him to be insane, an imbecile, or an idiot. I examined him eight or nine days ago. He was in fair condition physically except that he had bad teeth, arteriosclerosis, and high blood pressure. I found no evidence of insanity, imbecility, or idiocy. He talked fairly intelligent. I think he was of sufficient mental capacity to understand what getting married would mean on January 10, 1922."

Another witness testified:

"My name is John W. Horn and I live in Mineral Point. Have held several public offices: supervisor, city clerk, justice of the peace. I was supervisor for nineteen years and chairman of the county board for seven years. I gave that up six years ago and since that time I was deputy revenue collector of the United States. I know *Nicholas J. Roether* and have known him for fifty years and have seen and talked with him frequently. In my conversations and talks with him he seemed to talk sensibly. As far as I knew I didn't ever know there was anything the matter with him. He wasn't as bright as the brightest, but I always considered him fair. It is my opinion that he was of sufficient mental capacity to understand what getting married meant on January 10, 1922. I talked with him after he was married the first time and he said he got married because he was alone over there. I should think him mentally competent to understand what getting married meant."

The testimony of Josiah Paynter, who had been an assessor and member of the school board and a member of the county board, was substantially to the same effect, and Mr. J. P. Hankins testified:

"I have been justice of the peace for twenty-three years. Couldn't tell how long I have known *Nicholas Roether*. It may have been twenty years for all I know. I have seen him often during that time. During the last ten years I have seen him two or three times a week. I have had very little business dealings with him. Q. Well, from the deal-

ings you had with him do you form any impressions as to his mental capacity? A. Oh, yes, he was in my office sometimes to have papers made out, men owing him a little. Q. Did he seem to show reasonable mental capacity then? A. Just the same as other people that come to my office. Q. Did you ever have any difficulties with him in a business way? A. No, none whatever. Q. Did you have a little difficulty in getting some fees out of him? A. Sir? Q. Did you ever have any difficulty getting some fees out of him? A. Oh, sometimes. Q. He wasn't easy to get fees out of then? A. Sir? Q. He wasn't easy to get fees out of, was he? A. Well, not very easy, no; too smart for that. I have talked with him often during the last few years just the same as I would talk to other people. Q. Did he talk like an insane man to you? A. Oh, God, no. Q. Or like an imbecile? A. Oh, no. Q. Or an idiot? A. No. Q. Do you think he had mental capacity to understand what getting married meant, on January 10, 1922. A. You bet."

In view of the above testimony and the lack of any substantial contradiction thereof, we reach the conclusion that justice requires the setting aside of the trial court's findings of fact and conclusions of law. We need not attempt to characterize or measure the exact mental grade of the defendant further than to state that in our opinion it is far above the minimum required for a valid marriage.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter a judgment affirming the marriage. No costs will be allowed to either party. The defendant will pay the clerk's fees.

A motion for a rehearing was denied, with $25 costs, on March 9, 1923.