## JOHN W. MONTGOMERY

### *vs.*

### PEGGY U'NERTLE.

#### *Annulment of Marriage—Intoxication.*

In a suit to set aside a marriage between plaintiff, aged twenty, and defendant, a chorus girl, aged sixteen, on the ground of plaintiff's intoxication at the time of the marriage ceremony, *held* that the plaintiff fully met the burden on him to satisfy the court that he was not, at that time, in a condition to realize what was transpiring and the meaning of the ceremony.

*Decided March 15th, 1923.*

Appeal from the Circuit Court for Cecil County, In Equity (WICKES, J.).

Bill by John W. Montgomery, an infant, by Emerson R. Crothers, his procheim ami, against Peggy U'Nertle. From a decree for defendant, plaintiff appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Isaac Lobe Straus,* with whom were *Omar D. Crothers, James C. Furst* and *Henry H. Dinneen* on the brief, for the appellant.

*Charles Jackson* and *James F. Evans,* with whom was *Derlin A. McKindless* on the brief, for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

The bill of complaint in this case was filed by the appellant to have a marriage ceremony, which had been performed between the parties hereto, annulled and set aside upon the ground of deceit and fraud. The law in this State upon the subject does not need to be discussed at any length, as there have been three recent cases in Maryland in which the same relief was asked and in which the authorities not only in this State, but elsewhere, were fully considered and the cases set out with considerable detail. These are the cases of *Brown* v.*Scott,* 140 Md. 259; *Corder* v. *Corder,* 141 Md. 114, and *Owings* v. *Owings,* 141 Md. 416. There is no distinction between those cases and the one now under consideration except such as arises from the facts of this particular case.

The testimony given is quite voluminous, a good deal of it contradictory, as is apt to be the case in each instance where an annulment of a marriage ceremony is sought to be obtained. It presents, therefore, not a case where there is any possible reconciling of the differences of testimony, but one in which there is patent perjury on the part of witnesses upon one side or the other, and possibly both.

The parties to the suit were at the time of the performance of the ceremony both minors, Mr. Montgomery, the plaintiff, being between twenty and twenty-one, and Miss U'Nertle sixteen, and there is nothing in the antecedent history of the parties as detailed by them, or shown in the evidence, which calls for any special sympathy upon the part of an equity court. Mr. Montgomery, who had attended the Tome Institute, after leaving there, seems to have followed a somewhat checkered career, and Miss U'Nertle, according to her mother's statement, had been upon the stage from the time she was four years of age up to the time of the celebration of the alleged marriage. At that time she was a member of the troop known as the Ziegfield Follies, performing at the Garrick Theatre in Philadelphia. Mr. Montgomery had spent a considerable amount of time, after leaving school, in

the same city, making his headquarters at the Rittenhouse Hotel on Chestnut Street.

On the 13th of January, 1922, he was one of a party of young fellows who were taken by an intimate acquaintance of his, named Berger, on what is designated as "a party," in pursuance of which they went to the stage door of the Garrick Theatre and were there introduced to a number of members of the chorus, among whom the two figures with which we are most concerned in the present case were Miss U'Nertle and a Miss Gordon.

A couple of days later Mr. Montgomery left Philadelphia but returned there on the 24th or 25th of January, and on the evening of January 25th another party was organized and at the close of the evening performance these two young men, with at least a couple of others, met the chorus girls as they came out from the show and went with them to the roof garden of the Walton Hotel, a few blocks distant. Between supper time and the time when the young men met the girls, both Berger and Montgomery had had some drinks and were to a greater or lesser extent under the influence of liquor. It was then and there proposed that Montgomery and Miss U'Nertle should be married that night, and the first step looking toward a carrying out of this suggestion was the obtention of the services of a magistrate to perform the ceremony. This was about 1 o'clock A. M. on the 26th, and they were told that it would be impossible to obtain the services of a justice of the peace for the performance of a ceremony there in Philadelphia at that hour. Accordingly they next went to the Bellevue-Stratford Hotel and perhaps while there had some light refreshments. The night was an extremely cold one, the thermometer being at or near the zero point, and accordingly the party then went and obtained some moonshine liquor to the amount of between two or three quarts, and of this the young men partook.

The girls in the party apparently did not join in the drinking, but the result was that two at least and possibly three of

the young men were more or less under the influence of liquor. One young fellow in the party, who was at the time attending the Tome Institute, by the name of Gardner, appears from his own statement to have endeavored to have Montgomery abandon the idea of marriage which had been talked over. Miss U'Nertle was exceedingly strong for the marriage, according to the testimony of Mr. Sloan, another member of the party. Whether both were equally strong to further the marriage is not as clear, according to a number of witness who testified. Mr. Montgomery at this time was drunk and by his own testimony was too drunk to know just what did happen. Be that as it may, the parties then had gotten into a large automobile—a Packard six or seven passenger—for the purpose of being taken to some point where the marriage ceremony might be performed, and their first point of destination was Wilmington, Delaware. On the way there they stopped for a little while at a restaurant in Darby, a suburb of Philadelphia. The evidence of the chauffeur and of a companion of his who went along, apparently for the sake of the ride, notwithstanding the inclemency of the weather, is very positive as to Montgomery's condition. Some little disagreement or trouble arose between the parties about attempting to carry out the design that night, and Gardner, at the Bellevue-Stratford, tried to get Montgomery away from the party, while Miss U'Nertle sought to pull him back into the machine, and in so doing his collar was torn open. This she vigorously denies, as does her friend, Miss Gordon, who was also in the machine. From Darby the parties went on to Wilmington. They there were told by the captain of police of that city that they could not be married in Delaware unless they had been living there for at least ninety-six hours before the marriage. Here all of the parties seemed to have gone into the police station, mainly for the purpose of getting warm, and both the captain and two of the officers of the Wilmington Police Department testified to the entire sobriety of Mr. Montgomery. After some little stop in Wilmington,

the party again resumed their journey for Elkton in Cecil County, Maryland, and this point was reached about four o'clock in the morning of the 26th.

By this time all seemed to have been suffering a great deal from the inclemency of the weather, and they entered the building of the telephone company, as a point where they might get warm. Dice were produced by one of the young women, probably Miss U'Nertle, and all hands indulged in a game of crap. It was, of course, at this season of the year, dark when they entered. There is some evidence to the effect that Mr. Montgomery used the telephone while there to call up some one apparently in Harrisburg. Whether this was an entirely successful attempt is not altogether clear.

Along about seven o'clock on that morning, they called on Mr. McAllister, the deputy clerk of the court of Cecil County, for the purpose of securing the requisite marriage license and he went to the clerk's office for the purpose of issuing the same.

Mr. McAllister was undoubtedly an impartial witness, though called by the defendant in the case. He asked questions prescribed by the Act of Assembly; those relating to Mr. Montgomery being answered by Montgomery, and those regarding Miss U'Nertle being answered by her, and Montgomery was then sworn as to the truth of both his statements and hers. He signed the application and made the affidavit. The answers as given to the questions were undoubtedly perjured testimony. Mr. McAllister does not say that Montgomery was drunk but says that he had been drinking. The perjury was that of Montgomery, but was apparently committed at the instance of Miss U'Nertle. As to whether he was held up during the propounding and answering of these questions, this is affirmed by the chauffeur Simmons, but Mr. McAllister apparently took no observation on this point. He does, however, testify that Montgomery's collar was torn open, thus negativing the testimony of Miss U'Nertle, and from the clerk's office, after having been refused the solemnization of

the marriage by one minister, the party was piloted by a local chauffeur to the house where boarded a man described as the Reverend Daniel F. Lockerbie. Mr. Lockerbie describes himself as "an apostolic minister, a preacher of the gospel for thirty-five years, sometimes called an independent Presbyterian, sometimes a free lance who professed to be a minister of the Church of the Living God, but non-sectarian in the ordinary sense or the fighting sense of the word."

Mr. McAllister declined to say that Mr. Montgomery was drunk at the time of the issuance of the license, while the Reverend Mr. Lockerbie, in speaking of the party's appearance, says, "Their outer condition, which was all right, showed no indication whatever of debauchery or drunkenness." At the time when the call was made on Mr. Lockerbie he had not had his breakfast, but was on his way down stairs. He entered the parlor and, according to the version which he gives of the events of the morning, he performed the marriage. It further appears, from Mr. Lockerbie's evidence, that he had never preached in any church in Elkton, but had preached in a Baptist Church at Havre de Grace.

The marriage ceremony over, the parties all re-entered the automobile and were driven back to Philadelphia, reaching there apparently between ten and twelve o'clock. On this return trip, Montgomery seems to have slept most of the way. In passing, it is worthy of note that Miss U'Nertle did not act on the suggestion of the chief of police at Wilmington, of remaining there the required length of time, as she had to be back in Philadelphia to attend a rehearsal.

Upon reaching Philadelphia, the party went to the Hamilton Hotel, where Miss U'Nertle was boarding, but objection being made by the hotel authorities to permitting Mr. Montgomery to go to a lady's room, Mr. Berger produced the marriage certificate of the parties and they then went up and were in her room from a half to three-quarters of an hour. As to exactly what transpired in that room, there is a distinct variance in the testimony of Mr. Montgomery and Miss

U'Nertle, she asserting that co-habitation took place at that time, and Montgomery with equal positiveness denying it.

Mr. Montgomery further testified that, on the afternoon of that date, January 26th, having become satisfied that a marriage ceremony had been gone through with between Miss U'Nertle and himself, evidenced by the marriage certificate produced by Berger, he endeavored to consult a lawyer with a view to taking steps to have the so-called marriage set aside, but apparently did not see the lawyer and, upon that evening or the day following, went over to New York on business. He returned a few days later and again saw Miss U'Nertle. According to his version, his object in these calls on Miss U'Nertle was to procure her assent to declaring the whole matter a joke, not a marriage in any sense of the word, he, Montgomery, having been so much under the influence of liquor at the time as to have been entirely unconscious of what had taken place. On the occasion of this second call in Philadelphia, Miss U'Nertle again asserts the consummation of the marriage which had been gone through with, and the same is denied by Montgomery.

The case thus differs markedly from the case of *Owings* v. *Owings,* already referred to, where it was shown without contradiction that illicit relations had existed between the parties prior to the marriage. A marriage may be perfectly valid where it is recognized by the parties as creating the relation of husband and wife, even without any sexual co-habitation between them, but for this condition to exist, the parties must at the time of such recognition have been in full control of their mental powers.

The Circuit Court for Cecil County, in dismissing the bill filed by Mr. Montgomery, seems to have relied for the most part for testimony as to Montgomery's condition upon the evidence given by the police officers in Wilmington, and to have ignored or failed to give due weight to the evidence of other equally disinterested witnesses who testified as to the actual condition of Montgomery. With the conclusion of the court for Cecil County, this Court cannot agree. While much of

the testimony offered is scarcely worthy of belief, at the same time there is the evidence of equally disinterested parties who testify, some for the plaintiff, and some for the defendant, as to the effect of the moonshine liquor upon Montgomery, and the conclusion that seems most rational, in view of all of this conflict, is that Montgomery was to a large extent stupefied by the liquor which he had drunk, and if there was any considerable quantity of this taken along with him from Philadelphia while on his way to Wilmington and Elkton, he may well have been in a condition at the time of the ceremony where he was not competent either to know what was transpiring or to have a just appreciation and realization of what it meant. Some things are perfectly clear, namely, that to constitute a valid marriage under the laws of this State, there must be an understanding and appreciation of what the ceremony was which was being gone through with, and what were the legal consequences naturally deducible therefrom. The burden of proof, of course, rests upon a plaintiff to make out his case sufficiently to satisfy the chancellor of the truth of his allegations as set out in the pleadings. Certainly in the number of witnesses and the character of proof, with all of the discrepancies and contradictions, the plaintiff has fully met the burden which the law imposed upon him, and the decision from which this appeal was taken must therefore be reversed and the case remanded, to the end that the Circuit Court for Cecil County may enter a decree annulling and setting aside the pretended marriage.

> *Decree reversed and cause remanded, the costs both in this Court and the court below to be paid by the appellant.*