KUEHNE, Respondent, vs. KUEHNE, Appellant.

*November 12—December 9, 1924.*

*Marriage: Annulment: Who may maintain action: Grounds: Degree of insanity required to exist to have marriage annulled: Evidence: Sufficiency.*

1. The jurisdiction of a court to annul a marriage is statutory, and such annulment may be entered only for the reasons authorized by statute. p. 196.
2. Although sec. 2330, Stats., provides that no insane person shall be capable of contracting marriage, such marriage cannot be annulled at the suit of the public or upon grounds of public policy, but, under sub. (5), sec. 2351, only at the suit of one of the parties thereto and upon the ground that the insane person was not capable of assenting to the marriage contract. p. 197.

3. Not every form or degree of insanity authorizes the annulment of a marriage, but only such insanity as renders the party incapable of understanding or assenting to the contract. p. 197.

4. In an action by a husband to annul his marriage because of the insanity of the wife, the evidence (detailed in the opinion) is *held* to fall far short of showing that mental incapacity which is necessary to annul a marriage. p. 201.

APPEAL from a judgment of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Reversed.*

This action was brought by the plaintiff and respondent for the annulment of his marriage to defendant and appellant. The original complaint was for a divorce on the ground of cruel and inhuman treatment. Prior to the trial an amended complaint was served which prayed for an annulment of the marriage on the ground that the defendant was insane at the time of the marriage. The trial court found that at the time of the marriage the defendant was insane and incapable of assenting thereto, and granted judgment annulling the same. From such judgment the defendant, through her guardian *ad litem,* brings this appeal.

For the appellant there was a brief by *Otto G. Hackbarth,* guardian *ad litem,* and *Friedrich & Hackbarth,* attorneys, all of Milwaukee, and oral argument by *Otto G. Hackbarth.*

For the respondent there was a brief by *Hugo J. Trost,* attorney, and *John Senti,* of counsel, both of Milwaukee, and oral argument by *Mr. Senti.*

OWEN, J.    In this state it is held that the jurisdiction of a court to annul a marriage is statutory, and that such a judgment may be entered only for the reasons authorized by statute. *Hempel v. Hempel,* 174 Wis. 332, 181 N. W. 749, 183 N. W. 258. Sub. (5), sec. 2351, Stats., provides that a marriage may be annulled for "Insanity, idiocy, or such want of understanding as renders either party incapable of assenting to marriage, at the suit of the other, or at the

suit of a guardian of the lunatic or incompetent, or of the lunatic or incompetent on regaining reason, unless such lunatic or incompetent, after regaining reason, has confirmed the marriage; provided that where the party *compos mentis* is the applicant, such party shall have been ignorant of the other's insanity or mental incompetency at the time of the marriage, and shall not have confirmed it subsequent to such person's regaining reason." Although it is provided by sec. 2330, Stats., that no insane person shall be capable of contracting marriage, the annulment of such a marriage is not authorized at the suit of the public or upon grounds of public policy. It may be annulled only at the suit of one of the parties thereto and upon the ground that the insane person was not capable of assenting to the contract. Sec. 2351, Stats.; *Hempel v. Hempel,* 174 Wis. 332, 181 N. W. 749, 183 N. W. 258. Relief being granted only on the theory that one of the parties was incapable of assenting to the contract, it follows that not every form or degree of insanity authorizes the annulment of a marriage, any more than it does the setting aside of a will or the cancellation of an ordinary business contract.

In *Lewis v. Lewis,* 44 Minn. 124, 46 N. W. 323, the plaintiff sought the annulment of his marriage to the defendant on the ground that at the time of the marriage she was a kleptomaniac. The court states the law thus:

"There must have been, at the time of the marriage, such want of understanding as to render the party incapable of assenting to the contract of marriage. The plaintiff applies for a decree of nullity on the ground of his wife's insanity at the time of his marriage, of which he claims to have then had no knowledge. The particular form of insanity alleged was a morbid propensity on the part of the wife to steal, commonly denominated 'kleptomania.' It was not proved, nor is it found by the court, that she was not otherwise sane, or that her mind was so affected by this peculiar propensity as to be incapable of understanding or assenting to the marriage contract. Whether the subjection of the will to some

vice or uncontrollable impulse, appetite, passion, or propensity be attributed to disease, and be considered a species of insanity or not, yet as long as the understanding and reason remain so far unaffected and unclouded that the afflicted person is cognizant of the nature and obligations of a contract entered into by him or her with another, the case is not one authorizing a decree avoiding the contract."

This statement of the law is in accord with well-nigh universal authority. Thus in 26 Cyc. 902, it is stated that "A marriage may be annulled where either of the parties was an idiot or a lunatic at the time it was contracted. Mere weakness or imbecility of mind is not sufficient for this purpose, nor eccentricity or partial dementia, but it must be such a general mental derangement as prevents the party from comprehending the nature of the contract of marriage and from giving to it his free and intelligent consent." See, also, 1 Bishop, Marriage, etc. §§ 587 *et seq.*, and note to *Sims v. Sims* (121 N. C. 297, 28 S. E. 407) 40 L. R. A. 737. In sec. 600 Mr. Bishop declares what he regards as the true doctrine, as follows:

"The mental incapacity which disqualifies one for crime is such as renders it impossible he should entertain the criminal intent. The disqualifying incapacity for making a deed, a will, or a bill of sale of personal property is such as puts it out of the power of the person to exercise a *disposing mind in respect of the particular thing.* The question is not altogether of brain-quantity, or of brain-quality, in the abstract; but it is whether or not the mind could and did act rationally regarding the precise thing in contemplation. In a marriage case it is whether the alleged insane person acted rationally regarding marriage and the particular one in dispute; not, indeed, whether his conduct was wise, but whether it proceeded from a mind *sane as respects the thing done;* though, as to this, a broad degree of general insanity would of itself, without special inquiry into the individual transaction, cover the particular ground."

This principle dominated the decision of this court in *Hempel v. Hempel,* 174 Wis. 332, 181 N. W. 749, 183 N. W.

258. Although the subject under consideration in that case was feeble-mindedness as distinguished from insanity, nevertheless the decision turned on the question of whether the alleged *non compos* was capable of understanding and assenting to the marriage. In *Roether v. Roether*, 180 Wis. 24, 191 N. W. 576, it was held that one who had been adjudged mentally incompetent to manage his estate was not necessarily incompetent to enter into a marriage contract. While these were not insanity cases, they did involve other forms of mental incapacity, and the conclusions reached were in harmony with the general rule above stated.

With this understanding of the law we will proceed to an examination of the evidence in this case. The plaintiff testified that he and the defendant were married on June 14, 1905. He kept company with her for about a year prior to the marriage. He had misunderstandings with her prior to the marriage. He went with her for about six or eight months and then dropped her company, and she threatened to enter a convent if he would not come back to her and marry her. She had a jealous disposition. She always accused him of being with other girls. This was before they were married and was the reason he dropped her company. He testified that she was very queer on the day they were married, and that very day he concluded he had made a mistake. She was always queer and would do queer things. She accused him of being out with other women. On July 4, 1906, they were at his parents' home and she refused to go upstairs and watch the fireworks. He asked her to go upstairs and watch the fireworks and she hauled off and hit him on the side of the head. She sometimes refused to permit him to use his shaving cup that he got from a friend before they were married, and one day she took it into the basement and broke it. That was in August, 1907. During the same month they visited at his sister's house and she refused to sit down at the table because there was a friend of his sister's there that she did not approve of. She stayed

in the kitchen until after dinner was served and would not eat anything. He was a carpenter, and in 1907 he had work at Watertown. They lived in Milwaukee. She refused to permit him to go to his work alone. She followed him to the job and hung around the job and accused him of going to see a long-distance operator. She had to have him with her all the time because she refused to stay alone. One day, after a quarrel, she seized a bottle of carbolic acid threatening to commit suicide. He never felt safe after that. He couldn't join any clubs and couldn't go out unless he took her along. He testified that on her honeymoon she acted queer. She refused to eat strawberries that were picked near a barn. They had arguments about money. She always wanted to know where he kept his money. About four years after they were married she would set pillows around her bed so people from the outside couldn't see her undress.

In 1910 the defendant had an attack of the flu. Up to this time it had not occurred to the plaintiff that the defendant was insane. She was very nervous after that, seemed to be in a run-down condition. Plaintiff sent her to the Riverside Sanitarium. She was there about seven or eight months and he often went to visit her. She then returned home and he had a nurse with her for several weeks. After the nurse left they lived alone for a short time and he made preparations to transfer her to the Milwaukee county hospital because he was financially broke and couldn't stand any more expense. He went to see her occasionally at the county hospital and told her that as soon as she was well he would take her back home. He wanted her to get cured and wanted to take her back home.

On or about the 23d day of March, 1920, said defendant was transferred to the hospital for mental diseases at Wauwatosa, where she is at the present time. Two physicians testified that in their opinion she was suffering from a mental disease, known as dementia præcox, at the time of her marriage. They based the opinion on the fact that the dis-

Kuehne v. Kuehne, 185 Wis. 195.

ease was in full bloom at the time of trial, that it is a progressive disease, that it generally has its incipiency at the age of about fifteen or sixteen years, and that the jealous disposition and the bursts of temper to which plaintiff testified were manifestations of the disease.

If it be conceded that this testimony justifies a finding that her mind was diseased at the time of the marriage it falls far short of indicating that it was diseased to the extent that she had no understanding or appreciation of the nature of the marriage contract. The plaintiff himself testified that he had no suspicion that she was insane until after she was stricken with the flu in 1910. None of the witnesses who testified to her jealous disposition or peculiar conduct intimated that at the time they considered her insane. As was well said in *Elzey v. Elzey*, 1 Houst. (Del.) 308, at p. 319:

"It would be dangerous, perhaps, as well as difficult, to prescribe the precise degree of mental vigor, soundness, and capacity essential to the validity of such an engagement; which, after all, in many cases depends more on sentiments of mutual esteem, attachment, and affection, which the weakest may feel as well as the strongest intellects, than on the exercise of a clear, unclouded reason, or sound judgment, or intelligent discernment and discrimination, and in which it differs in a very important respect from all other civil contracts."

But we feel no hesitancy in saying that the evidence in this case falls far short of establishing that mental incapacity which is necessary to annul a marriage contract. The finding that the defendant was insane and incapable of assenting to the marriage contract is not supported by the evidence and there is no foundation for the judgment entered. It follows, therefore, that the judgment must be reversed, and the cause remanded with instructions to dismiss the plaintiff's complaint.

*By the Court.*—So ordered.