## LAURETTE ELFONT *v.* ROBERT L. ELFONT.
### [No. 33, October Term, 1931.]

*Decided January 12th, 1932.*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Allan H. Fisher,* with whom were *Fisher & Fisher* on the brief, for the appellant.

*Edgar Allan Poe, Jr.,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

In this case, Robert L. Elfont, by his father and next friend, Jonas Elfont, on the 24th day of December, 1930, filed a bill in the Circuit Court No. 2 of Baltimore City against Laurette Elfont, the wife of Robert, asking for the annulment of the marriage of Robert and Laurette, which was celebrated on the 20th day of August, 1926. The bill alleged that, at the time of the marriage and prior thereto, Robert L. Elfont "was of unsound mind and incapable of understanding the consequences of his act," and that he "continued to be of unsound mind after his marriage, and still is of the same mental incapacity." The court, after hearing evidence on the bill and answer filed thereto, on the 29th day of April, 1931, passed a decree annulling the marriage. The appeal in this case is from that decree.

460

The record discloses that in June, 1925, Robert L. Elfont, while visiting Asbury Park, N. J., met the defendant, Laurette Elfont, who was spending her vacation there. Her home was in New York City, where she was in the advertising business at a salary of fifty dollars per week. Robert remained in Asbury Park for about a week after meeting Laurette, and during that time they saw much of each other. After their separation, they corresponded, and he frequently saw her at her home in New York on occasions upon which he was required to be there in the transaction of business. On August 20th, 1926, over a year after they first met, when Laurette Elfont was on her way to the south to take a position which had been offered her, she and Robert met and were married in the City of Washington.

As shown by the plaintiff in support of the allegations of his bill, Robert L. Elfont entered the army of the United States on the 6th day of September, 1917, and was discharged January 11, 1919. On July 17, 1919, while in the Mayview Insane Asylum at Pittsburgh, Pa., he filed a claim alleging a mental disease. Thereafter he was in a number of other like institutions. In 1924 he was examined by three doctors of the Veterans' Bureau, who recommended a total rating for *"dementia praecox,* catatonic type." This rating was approved by the Board of Appeals, and on August 6th, 1924, the central office gave a permanent total rating of *"dementia praecox,* paranoid type, incident to service, incompetent on and after November 19, 1921." On August 4th, 1922, prior to the above adjudication of August 6th, 1924, it seems that an order of the Circuit Court No. 2 was passed by which Jonas Elfont, the father of the appellee, was appointed guardian of the estate of the appellee, and authorized to receive compensation awarded to the son by the United States Veterans' Bureau, amounting to $150 per month. At this time, Robert, at the request of his father, was permitted to live with them, and the record does not disclose that he was at any time thereafter, before September, 1930, in any institution of the class hereinbefore mentioned.

Dr. Levy, who is connected with the Veterans' Bureau, testified that he examined Robert L. Elfont on two occasions and had seen him on several other occasions at the bureau. The first examination was on July 7th, 1923, a report of which he was permitted to read in order to refresh his memory as to his findings.

The court asked Dr. Levy: "What was your conclusion? Answer: The conclusion at that time was that the patient was suffering from *dementia praecox* of paranoid type, which diagnosis is based on the fact that the patient was suffering from defects of adjustment in which * * *"

At this point in his testimony the court said: "Well, now, just for an ex-countryman, and not so long an ex-, and for the record, tell us what *dementia praecox* is. Answer: *Dementia praecox* is a term which is applied by Doctor Deseron to a type of mental disease which formerly was believed to occur on or about puberty. In other words, under this particular term, it would simply mean a dementia of puberty. The term has since been changed under a new classification. Under this particular term now, it would include *dementia praecox,* the chief features being a *dementia,* enlarged brain, a marked emotional leveling, so that the patient's mind is entirely split in so far as the thought processes are concerned. For example, he may consider that he is an individual of some import and yet at the same time realize the fact he is only a lesser being as far as his conduct is concerned.

"The Court: What effect does it have on a person's judgment or will? Answer: The judgment is markedly defective because the insight and this small mental splitting is not known to him. He lives in a world of unreality, at the same time making a type of adjustment in which he carries on a poor contact, don't know his real existence, at the same time never giving up the unreality."

The doctor, when asked by the court if Elfont was capable of making a valid deed or contract, said he would say "no". The witness, in speaking of the prognosis of the case, said it was bad "because there is a condition, a progressive condition, and he becomes deteriorated and with this deteriora-

tion, his insight, judgment and so forth, gradually are completely lost."

Dr. Levy next examined Elfont on May 27, 1924, and his report as to that examination is about the same as that of the first. "Q. Did you examine him after 1924? A. I recall seeing Mr. Elfont on several occasions. The exact dates I could not give." The doctor, though not having examined him since 1924, and having only seen him on several occasions thereafter, expressed the opinion that he had developed into a chronic progressive condition, and had become steadily worse.

On cross-examination the question was asked: Aren't there times when they are able to exercise good judgment? His answer was: "As far as the question of exhibiting good judgment at times is concerned, I will have to state that at times they may do things which are within the range of rational, but the whole basic thing is that right on top of that something of an episodic nature will occur to offset that. "Q. But a particular thing may be an exercise of good judgment, is that it? A. Yes. Q. Mr. Robert Lee Elfont, from February to July, 1929, conducted successfully and at a profit a retail shoe business in Pennsylvania with a stock of from seven to eight thousand dollars in trade and attended to all the incidents of the conduct of that business. Can you tell us whether, under the circumstances, you feel he was able at that time to execute a valid deed or contract? A. The only answer I can make to that question is judging from my examinations of Mr. Elfont at the several times I have seen him. I don't believe, knowing his mental condition as I do, that he would be capable of meeting the business problems, and so forth, or the high type of judgment to successfully conduct a shoe business. Q. A man with *dementia praecox* could not do it, is that it? A. Not consistently, no. Q. Would you say that persons suffering with *dementia praecox* don't have lucid intervals? A. No, I don't say that at all. They do have lucid intervals, but the great difficulty is that these periods are rather short. The chief difficulties are these marked episodes where the patient goes off on a marked

tangent. Q. Would you say that this patient, Robert L. Elfont, has lucid intervals? A. At this time? I am not able to pass on that."

Dr. Warner, who was also connected with the Veterans' Bureau, first examined Robert L. Elfont on July 3rd, 1920. He was asked what his examination disclosed. His answer was: "He was quite abnormal and extreme in conduct and thought. He was seclusive and suspicious, nervous and irritable, restless; he suffered with insomnia and generally nervous. He was suspicious, he suffered with depression and ideas of self-reference, and he had some persecutory ideas at that time and the conclusion was that he was suffering with a mental aberration called *dementia praecox*. That was the diagnosis established at that time."

Dr. Warner made another examination on June 1st, 1921. He was asked what his conclusions were from that examination. Before he answered this question, the court asked: "Doctor, were his symptoms or mental infirmities sufficient at that time to affect his judgment and will power? A. His judgment and will power were very much enfeebled at that time. The Court: Was he capable of managing his ordinary affairs? A. Not conclusively at that time. His judgment was erratic, he was emotionally unstable and irritable, he was not able to keep at anything, for any length of time. He would get tired and stop work and then have an idea that he wanted to do something else."

On October 20th, 1921, Dr. Warner made the third examination. The conclusion he reached from that examination was that at that time Elfont "was unable to maintain a continuous adjustment. He seemed to be indifferent and was evidently showing some slight deterioration in his emotional reactions; resentful attitude; he has enfeebled judgment, paranoidal; critical and resentful attitude at that time. * * * The diagnostic conclusion was *dementia praecox*, paranoidal, badly adjusted." A further examination was made by Dr. Warner on August 7th, 1923. His conclusions from that examination did not differ materially from those of the former examinations. The next examination made by Dr.

Warner was on February 6th, 1927. He said: "At that time he showed practically the same reactions and paranoidism. Ideas of self-reference, suspicions; irritability; poor judgment and unable to adjust himself socially." The diagnosis was *dementia praecox*. When the doctor was asked if the *dementia praecox* was in a worse form than indicated by previous examinations, he answered that he thought it was about the same condition. His physical condition was normal. This was the last examination made by the witness, though he saw him for a little while in the autumn of 1930. When asked what Elfont's condition was at that time he answered that he seemed much depressed. "Q. Was he in better condition than when you examined him in 1927? A. No, he seemed to be worse at that particular time." The witness was then asked if Elfont was competent to enter into any contract in the fall of 1926. He answered: "Well, from those reports I would say no, as far as his ability to comprehend and to meet the complications or the implications of the contract. I think that his judgment being enfeebled, as indicated in the earlier reports, I would have to answer in the negative."

"Q. Your diagnosis showed *dementia praecox*. Was that *dementia praecox* temporary or permanent and continuous in its nature? A. It was permanent and continuous." On cross-examination, the witness was asked: "Doctor, you say when you last saw him that he seemed rather depressed. That was in 1930, I believe? A. Last autumn, yes. Q. Wasn't the father, Jonas Elfont, present at the time? A. Yes. Q. Wasn't he, as the wife says, brow beating Robert, wasn't he yelling and hollering at him at the time? A. The father was very much excited at the time and seemed to be much disturbed about conditions. Q. Wasn't his conduct towards his son such that it would depress any person, normal or abnormal? A. I don't think it could have been fully so. It may have aggravated it somewhat. Q. Doctor, you really don't know whether or not this man had lucid intervals during the period between 1923 and 1927, is that correct? A. Well, I did not see him between those dates. Q. Then you

really would not know? A. Not positive; no, sir. Q. At this time you cannot say whether he has lucid intervals or not, can you? A. No."

Dr. Murdock, who is connected with the Sheppard-Pratt Hospital, and who specializes in psychiatry, testified that Robert L. Elfont entered the hospital September 3rd, 1930, and was discharged February 10, 1931. He was examined on October 8, 1930, and was found to be suffering from *dementia praecox.*

Jonas Elfont, the father, testified that in 1922 he was appointed guardian for his son Robert, who had been found by the Veterans' Bureau to be an incompetent, and continued to act as such until about three months prior to the trial of this case. The record does not disclose whether there was a guardian thereafter, or, if so, who that guardian was. The father testified as to the different hospitals or institutions in which his son had been placed for the treatment of his mental condition. He also stated that, shortly after the marriage, he had told Laurette of his son's mental condition and that his son was receiving money from the government because of that condition. In answer to the question whether his son, after his marriage, had not been employed by himself or his other son in the management of one or more of his or his son's stores, the father said: "Not that I know. He never carried on anything for me or my son, but only this he did. I will tell you." He then proceeded to make a statement which was not at all responsive to the question; and when asked why he had waited from August 20th, 1926, the date of the marriage, until the year 1930, before taking proceedings to annul the marriage, he likewise failed to give any intelligent answer thereto, but made charges against the wife, and, upon objection being made thereto, his answer was stricken out by the court.

In denial of the allegations of the bill, it was shown by the defendant that, after her marriage with Robert L. Elfont, she returned with him to Baltimore to the home of his parents. As testified by her, his father was not at home at the time, though this fact is denied by the father, and Laurette

was received by the mother alone. Shortly after their marriage they went to New York City to visit the wife's mother. It is, we think, clear from the evidence in the case that the marriage of the son was not at all satisfactory to the father.

It was not until the early part of 1927 that Laurette learned that her husband had been found by the Veterans' Bureau to be an incompetent, and that his father had been named as his guardian. This information was imparted to her by the father, Jonas Elfont. From the time of their marriage in 1926 to September, 1930, Robert and his wife lived together and were constantly with each other, with the exception of occasional visits that she made to her relatives in New York City.

On June 26th, 1927, a child was born of the marriage, but it lived only a few hours. During the period between 1926, the date of their marriage, and 1930, Robert was engaged in various occupations or enterprises. In 1927, as testified to by his wife, Robert was managing a store for his father or brother in Pennsylvania; and another time he was engaged in the operation or conduct of a store in Uniontown, Pa. While in New York, to which place he went to be with his wife, who was in the hospital, he was employed as a salesman by the Y Shoe Company, and at another time by Weber & Heilbronner, also as a salesman; and when living in Washington he was employed by Woodward & Lothrop in the men's furnishing department; and the wife at the time was employed at the Palais Royal. And there is not found in the record any satisfactory denial of these facts.

In September, 1930, Robert, at the instance of his wife, entered the Sheppard-Pratt Hospital, where, as disclosed by the record, he was said by the staff of the hospital to be suffering with *dementia praecox*. Immediately preceding his stay at Sheppard-Pratt, he had been at Spring Grove, where he was frequently visited by his wife. He was dissatisfied at Spring Grove, and at the instance of his wife he became a patient of the Sheppard-Pratt Hospital, where, as we have said, he remained until discharged in February, 1931. The wife, when asked what was the reason for placing him there,

said: "His father abducted him and subjected him to man-handling on the part of a county sheriff at Bel Air, Mary-land, which put my husband into such a condition it made it necessary for him to go to the hospital for treatment." After his discharge from Sheppard-Pratt, he went to live with his wife, with whom he has since lived; and, at the time of the trial, he was living with her at 3419 Holmes Avenue, Balti-more. The wife, at such time, was employed at A. Stewart & Co., in the advertising department, at a salary of forty dollars per week.

Laurette Elfont testified that she saw Robert at the office in New York City, where she was employed, the week fol-lowing their separation at Asbury Park. On that occasion he said he had come to New York on a "business trip," and he invited her out to lunch with him. For a period of about eight or nine months thereafter, his visits to New York, at which times she would see him, were at intervals of about every two weeks. During that time she received a number of letters from him.

In the latter part of May or early in June of 1926, while he was in New York, Elfont suggested marriage to her. Laurette was asked by the court: "Did you know, at the time this gentleman was courting you, that he was in the hands of a committee?" She answered: "No, sir; I never knew it. I did not know it until after I married him and his father told me. The Court: Did you know he was getting any compensation from the government? A. No, sir. Robert had told her, prior to the marriage, that he "was with his father, and that they had a chain of stores in small towns in Pennsylvania, but his home was in Baltimore; he lived there with his mother and sisters and brothers."

At the time of the marriage, Laurette Elfont was em-ployed at a salary of fifty dollars per week. When the wit-ness was asked what was the occasion of her meeting Robert in August, 1926, she said: "I was on my way to Texas to accept a position with the Rhodes, McLean Company, adver-tising, at a salary of fifty dollars per week, until the first

of the year, and then an adjusted salary of seventy-five dollars per week.   Q. Is that when you were married?   A. Yes."

After the marriage, Laurette testified that her husband took her to his mother's home in Baltimore, where they lived for a short time with his people.   Announcements of their marriage were sent out by Robert, the husband.   His family gave him a list of friends and relatives to whom to send them.   At the time of their marriage, her husband had a bank account upon which he drew from time to time.   She did not know that he received any checks from his father until possibly three months after the marriage, "when the family made it quite clear to me that he was not with his father.   At first they told me they had kicked him out of the business because he had done something they did not want him to do—married me—and then they politely told me to go to work, that I had married a poor man.   Then when it was really too late and I was realizing—well, I was in pretty poor condition.   Then they sprang the news that he was receiving a small monthly allowance, I believe seventy-five dollars a month, from the government."   To her, Robert "always acted like a perfectly normal person when his father was not around."

Robert, when placed upon the stand by the defendant, testified that he did not wish the marriage annulled, and when asked: "On August 20th, 1926, when you were married to Laurette Jacobson, did you understand that you were being married to her and becoming her husband?   A. Yes." Then he was asked: "Would you mind telling the court where you met your wife?   A. Why, I met her the same as any one else would meet any one.   I met her in Asbury Park, and we were married just the same as anybody else is married, and that is all there is to it.   There is nothing else to be said.   I like her, I am fond of her, and I am sorry it has gone as far as it has.   If it was all out and turned around, I would do the same thing."   He further testified that "I simply want her, I don't want no litigation.   That is all, you see.   That is the sum and substance of the whole thing."

There are a number of letters in the record written by Robert to his wife. The last one appearing therein as having been written before the marriage, dated January 3rd, 1926, is as follows:

"Baltimore, Jan. 3, 1926.

"Dear Laurette: Have the sketch and to please my ego rushed it off for framing. In my opinion you certainly have done remarkably well considering the short time you have been at it. It certainly has the professional touch and must say I was very pleased. By the way, recall our conversation about the Automaticket Theatre Guides? Well, I am inclosing the card and I don't see what's to prevent one from using the idea in New York. My notion is that you could use your home as your temporary business address. Of course, advice is easily given in an offhand manner. If in your opinion it would not be practical or profitable suggest that you drop it. Personally, I think it is a very clever advertising stunt—but of course my knowledge of advertising is somewhat limited, so on a whole I would make a poor sort of critic. What do you think of the inclosed article on the ten commandments? By the way, if you happen to get over anywhere near the Brooklyn Museum drop in and see the Tissot paintings—Or have you seen them? Supposed to have a bit of the atmosphere of the Holyland—then let's have your 'slant' of them. I had Huylers mail you some sweets and hope you received them.

"As ever,

"Bob.

"P. S.—Pardon the paper, but it was handy."

The letter dated May 16th, 1927, was the first one appearing in the record as having been written after the marriage, and is as follows:

"May 16th, 1927.

"Dear Laurette: Have youngster here waiting to take this up to the post office for me, and naturally you are going to find a great deal of grammatical errors in my little composition. To begin with, the

local printer has no orange card board for the store price tickets and he quoted a price of $3.25 for four hundred tickets. Knowing that you could better that figure and at the same time get the orange card board I mailed to you today by special delivery the Boston cut and want you to drop in and have one hundred tickets printed, price $3.50; one hundred printed, price $2.50; one hundred tickets printed $4.50 and one hundred tickets printed Boston Stores and on the bottom of the tickets printed as follows:

"Ask for Shoe ......

"This 'Ask for Shoe' and the half-inch line ...... will allow us space to mark the number of the shoe on.

"In all, four hundred price tickets—One hundred are to be blank. I will fill the prices in on those as I need them. Now the large cut nine by twelve will make a nice talking card. Have him print you from the large cut a dozen or more Boston slogans why the Boston shoes are better shoes. Have them printed on the same orange paper. For shoe talks, look at shoe chain store windows. See that you tie the price tickets and cards. I am inclosing a check for twenty-five and if you need more will mail it to you. Hope the Doctor's news was of the best and that your order has gone through for your furniture. Guess the above is as much as I am allowed to write as this youngster wants to go to supper and is waiting to take this letter to the post office, so will have to ring off. But save those kisses for me—don't squander them. Regards to the folks.

"Bob."

The occasion for writing the above letter, as stated by Laurette, was that "he was ordering some cards, price tags for the store and he thought he might get a better price from a New York printer." She at the time was in New York, where she had gone, leaving her husband in Pennsylvania, preparatory to going to the hospital, where her child was born the following month.

It is upon the aforegoing evidence that we are to decide the question presented by this appeal, that is, Was Robert L. Elfont, at the time of his marriage, so far insane as to render him incapable of entering into the marriage contract? The well-settled rule or principle of law, both in this state and elsewhere, by which we are to be controlled, is that, to render a marriage invalid because of insanity on the part of one of the parties to the contract, it must be shown clearly and convincingly that such party was unable to understand the nature of the contract of marriage and to appreciate the legal consequences naturally deducible therefrom. Every variation from a normal mental condition is not in itself enough to avoid the marriage contract. The mental defect or derangement must be one having a direct bearing upon such contract. If the party entering the marriage relation has sufficient capacity to understand the nature of the contract and the duties and responsibilities which it creates, the marriage will be valid. Mere weakness or imbecility of mind is not sufficient, nor eccentricity or partial *dementia*, but it must be such a general mental derangement as prevents the party from comprehending the nature of the contract of marriage and from giving to it his free and intelligent consent. *Montgomery v. U'Nertle*, 143 Md. 200, 122 A. 357; 18 *R. C. L.*, page 405, par. 26; *Kern v. Kern*, 51 N. J. Eq. 574, 26 A. 837, 840; *Cole v. Cole*, 5 Sneed (Tenn.), 59; *Van Haaften v. Van Haaften*, 139 Mich. 479, 102 N. W. 989; *Lewis v. Lewis*, 44 Minn. 124, 46 N. W. 323; 26 *Cyc.*, 902; *Bishop on Marriage, Divorce and Separation*, sec. 600; *Kuehne v. Kuehne*, 185 Wis. 195, 201 N. W. 506, 508; *Hempel v. Hempel*, 174 Wis. 332, 181 N. W. 749, 183 N. W. 258; *Concord v. Rumney*, 45 N. H. 423.

In *Cole v. Cole, supra*, it is said: "Every consideration of policy and humanity admonishes us that a contract so essentially connected with the peace and happiness of individuals and families, and the well-being of society, should not be annulled on this or any other ground, not clearly made out. The consequences, in many cases, would be most deplorable. The rights of property would be unsettled, and the peace of

families destroyed, to say nothing about the effects upon the innocent offspring. * * * The appalling character of these consequences is well calculated to impress the courts with the solemn duty of requiring a clear case for the application of the general principle to this delicate and important contract."

In the case of *Kuehne v. Kuehne, supra,* two physicians, as in this case, testified that in their opinion the wife was suffering from a mental disease known as *dementia praecox* at the time of her marriage. The court there said: "If it be conceded that this testimony justifies a finding that her mind was diseased at the time of the marriage, it falls far short of indicating that it was diseased to the extent that she had no understanding or appreciation of the nature of the marriage contract."

In *Kern v. Kern, supra,* the court said: "'The question is, had he sufficient mental capacity to understand the marriage contract? This is not to be solved by the mere opinions of persons who have been brought in contact with him, for, however eminent may be the authority, we must, on such an issue, be guided by the conduct and acts of the party when he has been called upon to exercise such abilities as he may possess. Each case must be decided on its own circumstances, and the ability of the party to understand can in no more satisfactory way be ascertained than by referring to his conduct in other transactions. A result so important * * * should not be reached except on the most convincing proofs of facts to sustain the grounds on which it is sought to be predicated."

In the case before us, the parties were married as early as August, 1926, yet no effort was made to annul this marriage until 1930, four years after, during which time the parties had lived together as man and wife, with the one exception, when Robert Elfont was placed, first, for a short while in Spring Grove Hospital, and then, at the instance of his wife, removed to the Sheppard-Pratt Hospital. The cause which produced the necessity for treatment at that time was the rather violent conduct of the father to the son, as testified to by the wife, whose testimony is at least par-

tially corroborated by Dr. Warner, who testified as to the excitable condition of the father towards his son.

During the four years between the time of the marriage and the institution of the annullment proceedings, which were not brought by Robert but by his father on his behalf, though against his wishes, Robert was engaged in various employments or work which it is hard to conceive could have been performed by him if his mental condition was so enfeebled as to render him incapable of understanding the nature of marriage and the consequences thereof. It is true that several physicians testified to a defective mental condition from which he was suffering, but it must be observed that most of the times when they made their examinations of him were before his marriage. Dr. Warner examined him in 1927, which was after his marriage, and he testified that, between the last preceding examination and that examination, Robert may have had lucid intervals, and he was unable to say that at the time of his marriage he was not enjoying a lucid interval. Dr. Murdock also testified that he was suffering with *dementia praecox* at the time he was in the Sheppard-Pratt Hospital in 1930. But it must be recalled that he was in that institution only for a few months before he was discharged. It is true that his discharge was at the instance and request of his wife, and not with the entire approval of the hospital staff. But, since that time, Robert and his wife, so far as the record discloses, have been living together happily and peacefully, and no acts of his during that time have been placed in evidence disclosing any mental trouble.

It is neither his nor his wife's desire that the marriage should be annulled, but it is the act of the father, who, for some reason not altogether disclosed by the record, wishes to sever the association existing between them as man and wife. Yet for four years, knowing his mental condition as described by the doctors, said to have existed at the time of the marriage, no effort was made on his part to annul the marriage.

When we consider the acts of Robert, that is, what he did in his various employments, between the date of the marriage

and the institution of these proceedings, and the intelligent character of the letters written by him to his wife both before and after the marriage, we cannot regard the evidence offered in support of the allegations of the bill as sufficiently showing that, at the time of the marriage, Robert did not understand the nature of the marriage contract or the legal consequences deducible therefrom. Consequently, we must reverse the decree appealed from.

The jurisdiction of the Circuit Court No. 2 of Baltimore City to hear and determine the question presented therein is questioned by the appellant in her brief filed in this court. It is contended by her that the validity of her marriage with Robert L. Elfont cannot be determined by a court of this state, as the marriage was not celebrated in this state, but must be heard and determined in the courts of the District of Columbia, where the marriage was celebrated. Whatever may be said of this contention, we do not feel required to decide the question thereby raised, as the question was not raised in the court below. Article 5, sec. 41, of the Code. All the parties to the proceedings were residents of the State of Maryland and were subject to the jurisdiction of the courts of this state.

From what we have said, the decree appealed from will be reversed, and the case remanded, that the bill may be dismissed in conformity with this opinion.

> *Decree reversed, and case remanded, that a decree may be passed in conformity with this opinion, costs to be paid by the appellee.*