[Civ. No. 22722. Second Dist., Div. One. May 12, 1958.]

HARLEY J. BRIGGS, Appellant, v. FRIEDA BRIGGS, Respondent.

Walter M. Rheinschild for Appellant.

Henry J. Sullivan for Respondent.

WHITE, P. J.—Plaintiff husband appeals from the order vacating and setting aside a judgment annulling his marriage to the defendant.

The judgment was rendered October 15, 1948, and upon defendant's motion set aside April 23, 1957. The record contains many affidavits both supporting and opposing said motion. The affidavits are in direct conflict. Ignoring the conflicts and considering all the affidavits in the light most favorable to the order granting the petition to vacate the judgment, a fair summary of the facts surrounding the marriage of the parties is as follows.

February 3, 1944, defendant, then a single woman, was committed to Camarillo State Hospital, hereafter referred to as "Camarillo." Plaintiff and defendant had been close friends for several years prior to defendant's commitment, and plaintiff knew about her commitment and visited her often during her stay at Camarillo.

May 25, 1948, plaintiff and defendant's mother visited defendant at Camarillo. Defendant was given a pass in their care. The two of them helped defendant select and buy a new outfit and change into it. Then plaintiff and defendant were married at Ventura and the latter returned to Camarillo.

June 3, 1948, defendant was given a leave of absence in the custody of her husband, the plaintiff. They went to defendant's mother's home and started cleaning and rearranging plaintiff's home to make it a suitable home for the two of them. June 8, 1948, defendant became quite ill and mentally deranged and on June 24th she was placed by plaintiff husband in a private neuropsychiatric sanitarium where she remained until July 26, 1948, when she was returned to Camarillo. Plaintiff continued to visit defendant at Camarillo and to sign in as "her husband."

August 12, 1948, complaint for annulment or divorce was

filed. August 18, 1948, a copy of the complaint and summons was left, according to the affidavit of service, with "Frieda Briggs" and "Guy Craigg, Records Office, Camarillo State Hospital." Plaintiff continued to visit defendant at Camarillo. According to defendant's affidavit, a few days after the service of summons and complaint upon her and before the expiration of defendant's time to answer, plaintiff told her that "he was not going through with it, that he realized he had made a mistake, that he loved her and always would love her" and that he had dismissed the complaint. Defendant did not answer and her default was entered.

September 27, 1948, plaintiff filed a petition for appointment of guardian ad litem for defendant, stating that she had been served, that the time for answer had expired, and that she was insane. The same day a form of order appointing guardian *ad litem* was filed. The form was never signed by the judge, and the record contains no minute order appointing a guardian ad litem.

In opposition to defendant's motion to set aside the judgment, plaintiff's attorney, Walter M. Rheinschild, avers that he filed a petition for the appointment of guardian ad litem for the defendant and prepared the order, pursuant to the superior court's rules, leaving blank spaces so that the clerk of the court could insert the name of the attorney who would be appointed, and affiant was told that the attorney who was appointed would notify him of his appointment; that on or about September 30, 1948, affiant was informed by E. L. Overholt that he had been appointed guardian ad litem for the defendant; affiant on that date wrote Attorney Overholt giving him the date and case number of defendant's commitment to Camarillo, enclosing a copy of the summons and complaint in the instant action, and stating "She was paroled to plaintiff on the 25th of May, 1948, and recommitted on July 26, 1948. I believe the best protection for both parties would be for you to file an answer."

Also in opposition to defendant's motion to set aside the judgment, Attorney E. Llewellyn Overholt avers that pursuant to the rules of the superior court, his name was in the list of attorneys who would be appointed as guardian ad litem for insane persons; that under the court rules when an attorney was so appointed guardian *ad litem* the court clerk would inform the attorney as to the title and number of the case and the name of the attorney who had filed the petition for the appointment of the guardian ad litem; that affiant did on or

about September 30, 1948, receive such notice and on the same day affiant telephoned plaintiff's attorney, who sent him the letter referred to in the affidavit of Attorney Rheinschild; that affiant prepared and filed an answer; that affiant did not check the file in the instant action to ascertain if the order of his appointment as guardian *ad litem* had been signed by the judge but relied upon the clerk's statement that he had been appointed; that affiant examined the file of the proceedings wherein defendant had been committed to Camarillo; and that "as a result of affiant's investigations it was impossible for affiant to make a meritorious defense on behalf of the defendant in this action."

An answer was filed by defendant's purported guardian ad litem on October 8, 1948. It admits her commitment and recommitment to Camarillo, and her stay from June 24 to July 26, 1948 in the private Neuropsychiatric Sanitarium to which she was sent by her husband soon after their marriage, and denies on information and belief, or lack thereof, the other averments of the complaint. The prayer is that "the Court determine the facts and grant such relief as will protect the interests of defendant and do equity to plaintiff. . . ."

Also on October 8, 1948, a stipulation signed by attorney for plaintiff and "E. Llewellyn Overholt, defendant by her guardian ad litem in pro per," that the "matter may be heard" on or after October 15th was filed. Beneath the stipulation, under the same date, appears the consent of plaintiff's attorney "that the default be set aside" and "that the answer may be filed," and "It is so ordered Oct. 8, 1948" signed by the Court Commissioner.

October 15, 1948, "Judgment of Annulment of Voidable Marriage (Default)" was signed, filed and entered. Said judgment contains the following recital: ". . . it appearing that defendant was duly served with process and has not appeared or answered the complaint, and that the default of defendant has been entered. . . ."

Plaintiff's attorney avers that "the Court Reporter, George Webber, who took the testimony of the witnesses at the trial on October 15, 1948, informed affiant that he had destroyed his notes pursuant to Superior Court rule"; that Dr. Louis Scharf, M.D., was the physician who was on the medical staff at Camarillo and who had charge of the defendant; that he testified that he informed the plaintiff when asked if the defendant was cured that she was and it would be safe for him to marry her; that Dr. Scharf also testified that he had been

in error and upon her return to Camarillo about July 26, 1948 he examined defendant and found that she was insane and dangerous.

Dr. Louis E. Scharf, M.D., avers that he was employed at the Camarillo State Hospital as a psychiatrist and neurologist from January to August, 1948; that he had personal charge of the defendant; that to his "best recollection" defendant was confined in the restricted ward "where the patients had to be watched night and day by the nurses, due to their suicidal tendencies" both before and after her 24-hour pass on May 25, 1948 and until June 3, 1948, when she was given a leave of absence in the custody of the plaintiff; that she was at all times insane and incompetent to enter into a marriage contract, and that he so testified at the trial on October 15, 1948. Dr. Scharf does not aver that he was asked by plaintiff, or that he informed plaintiff in May, 1948 that defendant was cured or that it would be safe for plaintiff to marry her. While there is no denial of the averment of plaintiff's attorney that Dr. Scharf did so testify, the omission of that averment from Dr. Scharf's affidavit and the statements therein made by him as to defendant's mental condition before and after her leave on May 25, 1948, warrant the inference that Dr. Scharf did not so advise plaintiff or testify at the default hearing. Further, the averment by plaintiff's attorney that Dr. Scharf testified that he had advised plaintiff on or about May 25, 1948 that defendant was cured and it would be safe for him to marry her casts grave doubt upon Dr. Scharf's averment in his own affidavit in opposition to defendant's motion to set aside the judgment that both before and after her marriage on May 25, 1948, she was a dangerous and violent patient confined in the "restricted ward."

According to defendant's affidavit, plaintiff never told her that he had obtained an annulment of their marriage. He continued to visit her as before and to take her to motels and hotels on 24-hour passes issued to her in his care. He continued to sign the visitor's register as her "husband." Also, Exhibit B attached to the affidavit of plaintiff is a convalescent leave agreement (undated), which plaintiff avers was signed by him on November 20, 1956. Just under his signature and probably in his handwriting, "Hus" appears as the relationship between patient and the signer.

On November 23, 1956, defendant was discharged from Camarillo and for the first time she and plaintiff were told by the doctors that she was cured. Plaintiff then took de-

fendant, according to her affidavit, to his home where they lived together as husband and wife until on or about January 5, 1957, when defendant learned for the first time that plaintiff had obtained a judgment annulling their marriage in 1948. Her certificate of recovery was issued to her January 3, 1957.

When defendant learned of the annulment on or about January 5, 1957, she left plaintiff's home and on March 4, 1957, she served and filed notice of motion to set aside the default and the judgment on the ground of fraud. Hearing was continued for the filing of more affidavits and the petition was granted April 23, 1957. The instant appeal was taken by plaintiff husband from the order vacating the judgment annulling the marriage.

Appellant urges that the court erred in finding: (a) that no guardian ad litem was appointed by the court; (b) that the service of summons and complaint had never been made upon the defendant; and (c) that plaintiff made representations to defendant which constituted fraud and prevented defendant from protecting her interests.

The court has no power to appoint a guardian *ad litem* for an insane or incompetent party defendant until the person for whom such guardian is to be appointed has been properly brought before the court. (*Redmond* v. *Peterson,* 102 Cal. 595, 599 [36 P. 923, 41 Am.St.Rep. 204] ; *Bank of America* v. *Carr,* 138 Cal.App.2d 727, 739 [292 P.2d 587] ; *Weisfeld* v. *Superior Court,* 110 Cal.App.2d 148, 152 [242 P.2d 29] ; *Akley* v. *Bassett,* 189 Cal. 625, 639 [209 P. 576].)

At the time of service of summons and complaint upon the defendant she had no guardian. The service of the summons and complaint upon her personally was therefore sufficient. (Code Civ. Proc., § 411, subds. 4 and 9 ; *Sacramento Sav. Bank* v. *Spencer,* 53 Cal. 737, 741 ; *Dunn* v. *Dunn,* 114 Cal. 210, 212 [46 P. 5] ; *Olivera* v. *Grace,* 19 Cal.2d 570, 576 [122 P.2d 564, 140 A.L.R. 1328].)

Defendant having been adjudged incompetent and having no general guardian, could appear in the instant action only by a guardian *ad litem* appointed by the court in which the action was pending, or by a judge thereof. (Code Civ. Proc., § 372.) Upon plaintiff's application, or upon its own motion, it was the duty of the court to appoint a guardian ad litem for the defendant. (Code Civ. Proc., § 373.) [4] The validity of the appointment of a guardian *ad litem* for an insane person is not affected by the fact that no prior notice of the application therefor was served on the insane person. (*Granger* v.

*Sheriff*, 133 Cal. 416, 418 [65 P. 873].) In the absence of a showing to the contrary, on appeal it must be presumed that the court performed its duty. (*Jones* v. *Alameda*, 85 Cal.App. 607, 612 [259 P. 976].) ■ In the instant action, however, the record shows that the purported order appointing a guardian *ad litem* for defendant was neither signed by the court and filed with the clerk or entered in the minutes of the court. The order is, therefore, ineffective. (*Jablon* v. *Henneberger*, 33 Cal.2d 773, 775 [205 P.2d 1], and cases there cited.)

■ The answer of Attorney Overholt as such guardian *ad litem* filed in the instant action can have no more effect than would an answer filed by any other stranger to the action. The stipulations made by Attorney Overholt as such guardian *ad litem* are likewise of no effect. Therefore, the judgment vacated by the order from which this appeal was taken was, as recited therein, a default judgment taken after defendant had been personally served and had failed to appear and answer.

■ Improper failure to appoint a guardian *ad litem* does not affect the jurisdiction of the court that proceeded without such appointment to decide the case. (*Emeric* v. *Alvarado*, 64 Cal. 529, 600 [2 P. 418]; *Dunn* v. *Dunn*, 114 Cal. 210, 212 [46 P. 5].)

■ Undoubtedly, however, such a judgment made and entered without the appointment of a guardian *ad litem* against an incompetent who has no general guardian, may be vacated in a proceeding for that purpose "if no innocent purchaser has acquired rights under it." (*Dunn* v. *Dunn*, *supra*.)

■ The statutes regarding appointment of guardians *ad litem* were enacted to protect minors and insane and incompetent persons—not to preclude them from their legal rights. (*Doyle* v. *Loyd*, 45 Cal.App.2d 493, 497 [114 P.2d 398].)

■ A default judgment taken against an incompetent person not represented in the action by a general guardian or a guardian *ad litem* should be set aside when properly disaffirmed. In *Olivera* v. *Grace*, 19 Cal.2d 570, at page 573 [122 P.2d 564, 140 A.L.R. 1328], Mr. Chief Justice Gibson, speaking for the Supreme Court, says: "Courts frequently set aside judgments rendered against incompetent defendants where it is probable that injustice has resulted." And at page 575: ". . . there exists a well-recognized jurisdiction in equity which has been utilized to relieve incompetent defendants from judgments taken under circumstances of unfairness and injustice. Equity's jurisdiction to interfere with final judg-

ments is based upon the absence of a fair, adversary trial in the original action. . . .''

In the instant action, the judgment having been taken by default must have been granted upon the ground alleged in the complaint, that defendant was at the time of the marriage of unsound mind, that she had been committed to Camarillo in 1944, that at the time of the marriage she was a patient there, that plaintiff was informed by defendant and the medical authorities at said hospital that defendant was cured of her mental illness and relying upon said statements he married defendant, that those statements were untrue and had plaintiff known of the true mental condition of defendant he would not have entered into said marriage.

From the complaint and judgment in the instant action it does not appear whether said judgment was granted upon the ground that defendant was at the time of the marriage of such unsound mind as to render the marriage voidable, or upon the ground that the marriage was the result of defendant's fraud upon the plaintiff. (Civ. Code 82, subds. 3 and 4.) If defendant was incompetent to enter into said marriage, then it is most likely that she also was incapable of committing fraud upon the plaintiff at that time.

Defendant, of course, was not present or represented in court. The doctors who knew her well during her entire stay at Camarillo were not called. The doctor who testified at the default hearing avers that he testified that he saw defendant a few hours before and a few hours after her marriage, that she was of such unsound mind that she was incapable of entering into a marriage contract, or any contract. Plaintiff's attorney avers that said doctor testified at the default hearing that at the time of the marriage he had been so mistaken as to defendant's mental condition that he had informed plaintiff that it was safe to marry her.

The degree of mental capacity at the precise time the marriage is solemnized controls its validity. Thus, a marriage contracted during a lucid interval is valid. (*Dunphy* v. *Dunphy*, 161 Cal. 380, 383 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A.N.S. 818]; *Vitale* v. *Vitale*, 147 Cal.App.2d 665, 666 [305 P.2d 690]; *Williams* v. *Williams*, 63 Cal.App. 482 [218 P. 783].)

Defendant avers that ''she was in possession of her faculties and had full knowledge of her acts and their consequences at the time of the marriage—May 25, 1948.'' That statement, with defendant's claim that plaintiff told her he had

dismissed the action, the undisputed evidence that plaintiff continued to visit her through the years, ''signing in'' at Camarillo as her husband, and the other affidavits both supporting and opposing defendant's motion to vacate the default judgment, fully support the order granting defendant's motion to vacate the default judgment. Fraud which prevents a real trial of the issues justifies the setting aside of the judgment. (*Jeffords* v. *Young,* 98 Cal.App. 400, 404 [277 P. 163] ; *McGuinness* v. *Superior Court,* 196 Cal. 222 [237 P. 42, 40 A.L.R. 1110].)

The order is affirmed.

Fourt, J., and Lillie, J., concurred.