## Zisser v. Zisser

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

*Paul A. Kunkel*, for libellant.

WOODSIDE, March 10, 1947.—Libellant in this case seeks a divorce on the ground that the marriage was procured by fraud. Respondent did not appear and the master recommended the divorce. Upon examination of the report and the testimony the court refused to approve the recommendation, but permitted libellant to list the case for argument which was subsequently held before the court en banc.

The contention of libellant is that respondent was not mentally sound, and that had he known it he would not have married her, and that her failure to disclose it to him was a fraud entitling him to a divorce under section 10 of The Divorce Law of May 2, 1929, P. L. 1237, 23 PS §10, which provides that the innocent and injured spouse may "obtain a divorce from the bond of matrimony whenever it shall be judged, in the manner hereinafter provided, that the other spouse . . . (g) shall have procured the marriage by fraud, force or coercion and which has not been subsequently confirmed by the acts of the injured and innocent spouse."

The Act of July 24, 1913, P. L. 1013, 48 PS §15, provides that "no license shall be issued where either of the contracting parties is an imbecile, epileptic, of unsound mind, or under guardianship as a person of unsound mind . . ." and it has been held that a marriage is void if either of the parties is insane at the time of the ceremony: Newlin's Estate, 231 Pa. 312 (1911). 1 Freedman on Marriage and Divorce 40, and cases there cited under note 3, but it has also been held that the court cannot annul a marriage or grant

a divorce on this ground: Pitcairn v. Pitcairn, 201 Pa. 368 (1902) ; Eisenberg v. Eisenberg, 105 Pa. Superior Ct. 30 (1932) ; Neff et al. v. Neff, 9 D. & C. 88 (1926).[1]

The action here is not brought on the theory that the marriage was void because respondent was not mentally capable of entering into the marriage contract, but rather that she committed a fraud upon libellant by not revealing to him that she was of unsound mind. We thus have the anomalous contention that one mentally unsound was sufficiently sound to commit a fraud by not revealing that she was of unsound mind. If she was mentally capable of committing a fraud, could she be so mentally defective that to fail to disclose her condition would be fraudulent?

At the argument counsel for libellant contended that respondent's mother and other members of her family committed a fraud upon libellant by not revealing to him the alleged mental condition of respondent. But the fraud that would entitle him to a divorce must be

---

[1] In Thorpe v. Thorpe, C. P. No. 4 of Philadelphia County, June Term, 1933, no. 8027, Judge Finletter in an unreported opinion where an effort was made to obtain a divorce on the ground of fraud stated:

"The particular fraud complained of is that the respondent had been confined in a lunatic asylum suffering from dementia præcox some six years before the marriage, and it is claimed that her silence on that subject was sufficiently fraudulent to justify us in annulling the marriage, or granting a divorce.

"We do not agree with this position, and both the master and counsel say that they can find no precedent for it among Pennsylvania decisions."

However, without quoting any authority for his words or action Judge Finletter, after pointing out that the evidence clearly established that respondent was not mentally unsound at the time of the marriage ceremony, said:

"We think the effort to have the marriage dissolved on the ground of fraud was wrong both in fact and law, but on the other hand we are strongly of the opinion that we should declare the marriage to be absolutely void because of the lunacy of the woman and we think that we would be justified and ought to find the marriage to be in fact void."

the fraud of respondent. Her relatives are under no legal duty to disclose her condition to libellant.

"Fraud" as used in the Divorce Law does not have the same meaning as "fraud" in connection with ordinary contracts. A. B. v. C. B., 50 D. & C. 454 (1944). The fraud referred to is the fraud that would render a marriage void at common law: Allen's Appeal, 99 Pa. 196 (1881).

Misrepresentation as to birth, name, rank, fortune, health, character or relationship whereby libellant would be induced to marry respondent have been said not to constitute such fraud as would invalidate a marriage: Ayres v. Ayres, 64 Pitts. L. J. 724 (1916).

Under any circumstances it is necessary that the thing relied upon be untrue in fact: Todd v. Todd, 149 Pa. 60 (1892). Here the thing relied upon is that respondent was of unsound mind. The evidence of this is in our opinion insufficient.

Libellant relies almost entirely upon his own testimony. He stated that he met respondent in St. Louis while he was in the service and although there only a short time he "began to get a fine affection for" her. He was sent overseas and continued to correspond with her for 31 months.

They subsequently made plans to marry when libellant returned to this country on a 45-day furlough in June 1945. When libellant arrived at his home in Harrisburg he received a telephone call from respondent. She was in St. Louis on her way to Harrisburg from California where she and her family had moved since libellant's stay in St. Louis. The following day she and her mother arrived and went to the home of libellant. What happened that evening is told by libellant in the following words.

"Everything was a little upset around the house. Monday night my sister, Mrs. Koons, her husband, my brother and mother were there and my wife, not my wife then. We got some ice cream and beer and were

sitting around talking. I poured a little beer for my wife. I was not paying any attention to her at the time. My brother-in-law went over and asked what was wrong with Mary. Her eyes were starting to roll, she seemed to pass out. I thought it was the result of a long trip and that she should have some air. I asked her what was the matter. She started telling me different things, such as having needles put in her and then telling about a brother-in-law being an attorney in California. She started talking about him because he was making so much money, then she started telling me about losing so much blood. She couldn't tell me anything that was stable, her stories were all jumbled up. Right away I knew there was something wrong. Anyone could tell there was something, there was really definitely something wrong. However, I felt that if we were married maybe this would pass over. It upset me quite a bit . . ."

Four days later they were married. What happened is told by libellant in the following words:

"Friday afternoon we got married and on the altar the rabbi pours out some wine, during the ceremony she drinks from the glass as well as I do. Also there are candles burning on the altar and the rabbi makes the statement that these lights will continue—will never cease burning, life will always go on. . . . Friday night we got a room in the Penn Harris. We went to bed and during the course of the evening, she would make the remarks about some cousin of hers was just killed and she would go and get these candles—evidently she had stuck them in her pocketbook. She had laid them on the dresser. She would get these candles and start making prayers over them. During the course of these events, I knew definitely there was something missing and she was too—she sat near the window making Jewish prayers all night. She talked irrationally. I told her that this definitely could not go on,

that there was something wrong. I told her we would go home to my mother and thrash this thing out. During this time I was so upset because I never harmed anybody. I was ready to jump out of the window. I know that no one gets married for one night. Finally, she said she would go up to see my mother. My mother is ill with heart troubles and diabetes. My mother told us to come home and have breakfast. I told my mother that I could not live with this girl any more. I started to cry and she told me to go to bed. I woke up later and found my sister, Mrs. Koons, in the front room with this girl. Later mother censored me for doing such a thing until she sat down and talked with the girl and she found out for herself what was the matter. She knew then that I had been deceived by the whole matter. It was on a Saturday night I went downtown by myself. She (his wife) decided to go to Philadelphia to her mother and her uncle. I came home later in the evening. I was quite upset . . ."

"I might add, she spoke on our honeymoon night of being in a hospital and again making the statement that she had so many needles put into her and lost so much blood and that a man had tried to commit suicide on account of her, which I doubt very much. These things just come to me as I think back over them."

There is very little other testimony upon which there could be based a conclusion that she was mentally unsound. She obtained a marriage license. Had there been an indication that she was mentally unsound the clerk would have been legally bound to refuse her a license. It is presumed that he saw no evidence of it. She was married by a prominent rabbi of this city. He saw her and talked to her the day before the marriage, as well as during the marriage ceremony. If he had seen any signs that she was mentally unsound surely he would not have performed the ceremony.

There is much testimony about her saying she was in a hospital, lost blood and had needles stuck into her.

Although libellant would have us infer from this that she was in a hospital for mental treatment there is not one word in the testimony to support or suggest that her visit to a hospital was for such purpose.

There is another reason why this divorce must be refused. Libellant was asked by his counsel, "Did you say you found her to be not normal?" And he answered, "I found that out the first night I was home, but I couldn't bring myself to not go through with it." Thus, he says that several days before he married her he knew of the condition of which he now complains.

How can he contend that the marriage was procured by her fraudulent failure to disclose what he admits he already knew?

And now, to wit, March 10, 1947, the divorce is refused and the libel dismissed.