DeMedio *v.* DeMedio et al., Appellants.

256

Argued June 9, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Anthony S. Minisi,* with him *Gerald J. McConomy,* and *Wolf, Block, Schorr and Solis-Cohen,* for appellants.

*Alan E. Boroff* and *Morris Gerber,* with them *David M. Jordan,* and *Wisler, Pearlstine, Talone & Gerber,* for appellee.

OPINION BY CERCONE, J., September 11, 1969:

In June, 1957, Samuel W. DeMedio instituted an action against his wife Rose to annul their marriage of September 6, 1947, on the ground that the wife was mentally incompetent to enter into a marriage contract and, further, had falsely sworn as to her mental condition when applying for the marriage license in August, 1947. He also asked, in the alternative, for a decree of divorce a.v.m. on the grounds of fraud and indignities.

The case was heard by a Master who held hearings covering a period from May 6, 1960 to December 9, 1965 and then filed a report with the Court recommending an annulment of the marriage based on his finding that the wife was mentally ill and incapable of entering into a valid marriage contract.

After argument upon the wife's exceptions, the court en banc referred the matter back to the Master to consider and pass upon the husband's right to a decree of divorce. The Master then filed a Supplemental Report recommending, in the alternative, a decree of divorce on the ground of fraud but not on the ground of indignities.

The court below adopted the Master's findings of fact, conclusions of law and his recommendation of a decree of annulment. It dismissed the wife's exceptions and entered a decree of annulment, finding it unnecessary to consider the husband's right to divorce.

The wife has appealed to this Court, contending that (1) plaintiff did not sustain his burden of proving her incompetent at the time of the marriage ceremony; (2) even if such burden had been met, his subsequent cohabitation with her for a period of seven years after the alleged invalid marriage constituted, under all the circumstances, a ratification of the marriage contract; (3) he had prior knowledge of her mental illness and is therefore estopped from denying the validity of the marriage on that basis; and (4) he had subsequent knowledge of her mental illness and continued to cohabit with her thereafter and is therefore estopped from contending the marriage is now invalid.

In considering this problem we must keep in mind the legal proposition that if a marriage is void because of the mental incompetency of one of the parties to enter into a valid marriage contract, knowledge on the part of the other party of such incompetency either before or after the marriage ceremony does not remove

the impediment to a valid marriage and the incompetent party does not have access to the legal defense of either estoppel or ratification. Our statute, Act of May 2, 1929, P.L. 1237, §12, as amended, 23 P.S. §12, provides:

"In all cases where a supposed or alleged marriage shall have been contracted, which is absolutely void . . . for any other lawful reason, the said supposed or alleged marriage, may, *upon the application of either party,* be declared null and void. . ."

It is to be noted that unlike the prior annulment statute of 1859 the application is not limited to the innocent and injured party.[1] Also, our annulment statute differs from those of other states which provide that an annulment cannot be obtained where the parties have voluntarily cohabited as husband and wife after knowledge of the fraud or insanity at the time of the marriage ceremony of one of the parties. For example, in *Sweeney v. Sweeney* (1922), 96 Vt. 196, 118 Atl. 882, the Supreme Court of Vermont construed Vermont's General Law 3555 which provided that a marriage shall not be annulled for fraud if, before action, "the parties voluntarily cohabited as husband and wife." In *Wendel v. Wendel* (1898) 30 App. Div. 447, 52 N.Y. Supp. 72, and *McGill v. McGill* (1917), 179 App. Div. 343, 166 N.Y. Supp. 397 (affirmed 226 N.Y. 673, 123 N.E. 877), the court had before it section 1750 of the New York Code of Civil Procedure providing that "a marriage shall not be annulled on the ground of fraud, if it appears that at any time before the commencement of the action the parties voluntarily cohabited as husband and wife with a full knowledge of the facts constituting the fraud." In *Johnson v. Johnson,* 104

[1] *Stump v. Stump* (1934) 111 Pa. Superior Ct. 541; *Maurer v. Maurer* (1948) 163 Pa. Superior Ct. 264; *DeRosay v. DeRosay* (1948) 162 Pa. Superior Ct. 333; *Blinn v. Blinn* (1936) 122 Pa. Superior Ct. 542; *Wagner v. Wagner* (1943) 152 Pa. Superior Ct. 4.

N.W. 2d 8, the Supreme Court of North Dakota had before it for consideration section 14-0401 of the North Dakota Code which provides that a marriage may be annulled "for any of the following causes existing at the time of the marriage : . . . (3) That either party was of unsound mind, unless such party, after coming to reason, freely cohabited with the other as husband or wife; . . ."

The Pennsylvania annulment statute contains no such qualifying element. We cannot supply this qualification by judicial interpretation. Our statute is clear : Either party can apply for the annulment of a void marriage; the application is not restricted to an innocent and injured spouse and therefore the annulment can be obtained regardless of plaintiff's knowledge either before or after the void marriage ceremony. Under our statute, neither estoppel, unclean hands, laches, or ratification can make valid a defective marriage ceremony.[1] Any complaint as to the reasonableness of this rule must be addressed to the legislature and not to the court.

We, therefore, turn our study to the question : Was the marriage contracted between the parties void by reason of the wife's mental incapacity to enter into a marriage contract? The lower court held the marriage void for that reason. It is this Court's duty to make an independent review and study of the matter and to exercise its independent judgment upon the whole record : *Faivre v. Faivre,* 182 Pa. Superior Ct. 365 (1956) ; *Fitzpatrick v. Miller,* 129 Pa. Superior Ct. 324.

A study of the voluminous record in this case and of the applicable law of Pennsylvania and of other ju-

---

[1] Note: This rule is to be distinguished from and not to be interpreted as disturbing the rule (hereafter discussed and applied) that cohabitation after knowledge of the defect in the ceremonial marriage may establish a valid common law marriage.

risdictions compels us to disagree with the findings and conclusions of the court below and to hold that the decree of annulment cannot be supported by the evidence and the law. The record reveals the following facts:

Plaintiff and defendant were married on September 6, 1947, in a Roman Catholic ceremony in Narberth, Montgomery County, Pennsylvania, after a courtship of about seven months. Defendant was then approximately 27 years of age. She had resided in Boston and plaintiff, then 30 years old, had resided in Philadelphia. They met in February 1947, when defendant was visiting relatives in Philadelphia.

Defendant, since 1941, suffered acute psychotic episodes or exacerbations consisting of sudden and violent flares of temper, sudden unpredictable movements and impulsive behavior, which condition was later diagnosed as paranoid schizophrenia. These episodes of acute exacerbation or psychotic behavior interrupted her lucid intervals for indeterminate periods of time. In 1941 and 1944 defendant received treatment for this condition. In May, 1947, during the period of courtship with plaintiff, the defendant suffered an exacerbation as a result of which she went to a rest home in Boston and received seven shock treatments at a nearby hospital. Plaintiff admits that he knew she was so confined, and admits he called her by telephone and sent her flowers at the institution. He testified, however, at the trial that he made no inquiries as to the nature of her ailment. He testified, "Well, because a person happens to be in a hospital you wouldn't question what their condition was because you are going to marry them." In July, 1947, plaintiff and defendant spent a weekend in Ocean City, New Jersey, at the home of the defendant's relatives. While there, defendant suffered another psychotic episode requiring her uncle, Carmen Perri, to call a Dr. Miraglia, a

friend of both the uncle and of the plaintiff. Dr. Miraglia arranged for defendant to be given a psychiatric examination by Dr. Stephen J. Deichelmann at the Dufur Hospital in Ambler, Pennsylvania. On July 11, 1947, Dr. Deichelmann examined defendant and reported to Dr. Miraglia, inter alia, as follows:

". . . This 27 year old white female was examined in the presence of her uncle. She was tense and somewhat fearful and at times during the interview was definitely hostile to suggestions made. She was oriented for place and person, but showed gross memory defects for events of the past few years. By her own statement, she is moody and 'makes people around her unhappy'.

"In 1941 . . . she then [after a broken engagement] became very much depressed and had electric shock treatment. She does not know the number of treatments she received at that time. Since then she has not been really well for any sustained period of time. She has had paranoid feeling toward her mother and sister who, apparently, are hard working people and are attempting to keep a home together in the absence of the father, who has been separated from the family for many, many years. She has had many changes in jobs and seems unable to settle down and carry through any projects. About a month and a half ago (May 1947) she became so moody and depressed that shock therapy was again advisable and she was given seven treatments. She does not feel that this improved her very much, but it made her memory markedly defective. These treatments apparently were given on an ambulatory basis as she stayed in a rest home and was taken to another institution where the treatments were given. She states that at that time she was under the care of Dr. Raymond J. Duffy of 482 Beacon Street, Boston, Massachusetts.

"Patient has been engaged to another man,[1] recently, and they have set a date in September for their wedding. They apparently quarrel a great deal and the patient is doubtful as to whether or not they should go through with the marriage. She states very definitely that she wants to be married to this man and loves him, but because of her 'moody' state she cannot readily make up her mind about anything. She is, at present, visiting in the home of a relative in the vicinity of Conshohocken, where her fiance lives, and she states that she is not at all anxious to return to Boston. When it was suggested to her that she remain here at this hospital and receive further shock treatment, she became fearful and then asked if her uncle would leave the room for awhile, as she wished to discuss something she could not in his presence. When he left the room, she related some supposed facts regarding her sexual history as follows: . . .

"When she was reassured that this was not bad or anything for her to feel guilty about, and was more or less normal sex play of many engaged couples, she seemed more comfortable about it, however, she steadfastly maintained that she did not want to stay at the hospital, and when her uncle returned to the room, his pleas or any suggestions were to no avail.

"After we dismissed Miss DiNatale, we talked with her uncle alone. He then told me that this girl was definitely not well and had not been well at home. She had been impulsive and irritable to the point that her mother was afraid of her and had wished that the uncle would get her into a hospital while she was down here for further treatment. He said that she is subject to sudden flares of temper, sudden unpredictable movements, was emotionally labile and impulsive. He gave the onset of the mental state to the time when patient

---

[1] Referring to plaintiff in this case.

wanted to join the WAC and her mother refused to let her do so. She has been paranoid toward her mother since that time.

"In answer to your question as to my feeling whether your friend should marry this girl, I would say definitely not. I conceive her condition as being paranoid schizophrenia with all the chronicity illness that this diagnosis involves. If she can be placed in a hospital for a prolonged course of electric shock and possibly insulin shock, there is a vague possibility that she will recover. However, you know the recovery rate in paranoid schizophrenia is even less than in the other forms of schizophrenia, with the exception of hebephrenics. Certainly [s]he should not plan on marrying her in September of this year. I regret to have to give you this opinion, but I am sure it will be easier for your friend to stay out of trouble than it would be to get out of it once he was in.

"Sincerely,
/s/
Stephen J. Deichelmann, M.D.

SYD :ed"

Plaintiff alleges he lacked knowledge of defendant's psychotic episodes prior to the marriage. The record reveals, however, that he called defendant by telephone and sent her flowers when she was hospitalized in May 1947; that he was with her in Ocean City on that July 1947 weekend when she suffered another psychotic episode. Under these circumstances, his claim that he did not know of, nor did he make any inquiries into, the nature of his fiancee's illness lacks credibility since it reveals a most unnatural lack of response to one so important in his life. Plaintiff stated he was not told of Dr. Deichelmann's report until 1948 and this also seems most unlikely in view of Dr. Deichelmann's recommendation to Dr. Miraglia that his friend, the

plaintiff, not marry defendant. The testimony of Carmen Perri, defendant's uncle, would seem more probable. Mr. Perri testified that plaintiff was present when defendant suffered her exacerbation in July at his home; that he was present when Dr. Miraglia described defendant's illness and when he expressed his opinion that she should not be married until she had some other medical advice. The uncle further testified that he at that time told plaintiff that he should open his eyes, that defendant was ill, and that he should be careful before entering into the marriage, that plaintiff should hold off, or call it off altogether, to which the plaintiff replied, according to the uncle's testimony, "Well, I don't think she is that bad. I love her. And I think she will be all right after she is married."

The parties thus proceeded with the marriage arrangements and after church investigation and separate interviews, they were married in a Roman Catholic ceremony. The performance of such ceremony provided evidence of defendant's competency to enter into a marriage contract, *Zisser v. Zisser*, 60 Pa. D. & C. 21 (Dauphin Co. 1947); 4 Am. Jur. 2d, Annulment of Marriage, §87 (1962). This evidence was supplemented by the testimony of defendant's cousin and defendant's sister that defendant acted as a normal person during the period shortly before the wedding and on the wedding day itself. Plaintiff, on the other hand, testified as to certain erratic and strange behavior of defendant *after* the wedding, while on their honeymoon and on different occasions during the six years they lived together until June, 1954.

In June, 1954, defendant suffered a severe psychotic attack which required her to be hospitalized in Eugenia Hospital, in Philadelphia, Pennsylvania, under the care of Dr. Michael Grassi. She was released from that hospital in September, 1954. After her release, the parties separated and never cohabited thereafter.

In May, 1955, defendant went to live with her mother in the Boston area. Since then she has been hospitalized several times with an average confinement of three months on each occasion.

On June 29, 1956, defendant was adjudged incompetent by the Probate Court of Suffolk County, Massachusetts. In February, 1957, she filed a support action against plaintiff and he was ordered to pay $80.00 per week. This was later increased to $100.00 per week when she filed a Petition for alimony pendente lite, additional counsel fees and costs.[1]

In June, 1957, plaintiff instituted this action of annulment or, in the alternative, of divorce, and on August 26, 1957, Elkins Wetherill, Esquire, was appointed guardian ad litem for defendant, since she had been adjudicated an incompetent and was then a patient in the Massachusetts Mental Center in Boston, Massachusetts.

On July 23, 1963, during the period in which hearing were being held before the Master, C. Edmund Wells, Esquire, defendant petitioned the Master to stay the proceedings until it had been determined whether she was competent to defend this action or whether she was hopelessly insane, as specified by the Act of May 2, 1929, P.L. 1237, 23 P.S. 53. Expert testimony relating to defendant's mental condition was heard by the Master and on August 27, 1963, he determined that she was sufficiently competent as of that date to make a defense to the divorce action and decided her competency or incompetency was irrelevant to the annulment action. Defendant filed exceptions to these findings of the Master, but the court below affirmed the holding that defendant's sanity or lack of

---

[1] This Court in *Commonwealth ex rel. DeMedio v. DeMedio*, 210 Pa. Superior Ct. 520 (1967), upheld the right of the defendant to support.

it was immaterial to an annulment proceeding alleging mental incompetency. We believe that determination was in conformity with this court's holding in *Faivre v. Faivre*, supra, wherein we stated:

"To interpret section 18 as prohibiting annulment proceedings when the defendant is insane would require a finding that the Legislature set forth the substantive law of annulment and then gave it no effect for a reason unrelated to the matters which made the marriage a nullity from the very beginning. Obviously the subsequent insanity of a defendant will not validate a previous void marriage; and it should not be permitted to suspend the operation of the law so long as the rights of the insane party are protected. The status of the parties continues to be that of unmarried persons regardless of the subsequent insanity of one of them. We are convinced that the Legislature could not have intended that the relationship remain in a state of confusion merely because the defendant became a lunatic."

On June 18, 1965, defendant filed a petition for permanent alimony for an insane defendant, which the court below denied on the ground that alimony is a creature of divorce but not of annulment. This was error, for it was already determined in *Stump v. Stump* (1934) 111 Pa. Superior Ct. 541, 170 A. 393, that since our annulment statute states that the annulment action shall be "in accord with the principles and forms hereinafter prescribed for cases of divorce from the bond of matrimony", the alimony provisions were applicable.

On July 5, 1968, the court below decreed the annulment on the reasoning that defendant was mentally incompetent to enter into a marriage contract on July 11, 1947, and that this incompetency continued to and existed on September 6, 1947, the date of the marriage, because, according to Dr. Deichelmann, she could not

have recovered sufficiently by that time to be competent. The court felt the doctor's opinion was substantiated by the husband's testimony as to his wife's conduct during the honeymoon.

The evidence which the court accepted in order to negate the marriage ceremony between the parties here was that provided by Dr. Deichelmann and the plaintiff. It is our opinion that the court erred in holding their testimony sufficient to prove the marriage was not contracted during a lucid interval and that the mental condition of defendant as found by Dr. Deichelmann to have existed on July 11, 1947 had continued to the time of marriage two months later. Further, even conceding Dr. Deichelmann's opinion of her mental condition, the court erred in accepting it as proof of her incompetency or inability to enter into a valid marriage.

The testimony at trial of both psychiatrists, Dr. Deichelmann and Dr. Grassi, agreed that the type of mental illness suffered by defendant would provide for lucid intervals, during which time the consequences of a marriage contract admittedly would be realized by defendant. In fact, Dr. Deichelmann testified that patients, such as defendant, are considered mentally ill "in a sort of residual fashion." The court below noted in its opinion:

"The problem confronting us arises from the nature of schizophrenia itself, which admits of certain relatively lucid periods between acute attacks. If defendant was in one of these remissive periods at the time she was married, it is possible she was competent to enter a marriage contract. However, we agree with the Master that the weight of the evidence preponderates against such a possibility."

We find, however, that the weight of the evidence does preponderate in favor of such possibility. Though Doctor Deichelmann testified it was his opinion from

the condition in which he found the defendant on July 11 that it would have taken four months, with full treatment, for her to have recovered from that attack, he did admit it was "possible" for her to have had a lucid period at the time of the marriage. He further admitted this condition varied with each individual and that he did not see defendant either before or after the July 11, 1947 examination.

Dr. Grassi who was defendant's attending psychiatrist during the later attacks testified that from the defendant's case history "this girl must have had, at that time, *short-lasting* psychotic episodes, following which she went into remission for a period of months or years, whatever it was, and during which she functioned well and could be, I suppose, considered competent or she wouldn't be doing her job and wouldn't be socializing."

There was also lay testimony that defendant made rapid recovery from her attacks.

It must be kept in mind that defendant was not an adjudged incompetent or adjudged insane person at the time of the marriage ceremony. There is thus the presumption of sanity and the presumption of the legality of the marriage, which presumptions can be overcome only by presentation of clear evidence that defendant was not capable at the time of the marriage ceremony to understand the nature of the marriage contract and its consequent effect. This rule flows from considerations of public policy, as well summarized in 35 Am. Jur. §13:

"The general rule based on considerations of public policy and humanity is that a marriage contract is so closely connected with the peace and happiness of individuals and family and the well-being of society that it should not be annulled on the ground of mental incapacity unless clearly made out."

270

This rule was followed by this court in *Nonnemacher v. Nonnemacher*, 159 Pa. 634, wherein the Court affirmed the lower court's charge that, "Every person is presumed to be sane, until the contrary is shown. The burden in this case is on the plaintiffs to satisfy you by the weight of proof that on October 25, 1891, Molton Nonnemacher was of unsound mind. If the proofs in the case on this question are equal in weight and reliability, then the presumption of sanity must prevail."

In *Johnson v. Johnson*, 104 N.W. 2d 8, the Supreme Court of North Dakota stated the rule in this manner: "Where a marriage in fact has been proved, a presumption arises that such marriage is in all things valid. 34 ALR 464 and 77 ALR 730. And further, it is held, almost universal in application, that a person who has contracted a marriage is presumed to be mentally capable of legally contracting the marriage relationship. The burden of overcoming such presumption is upon the party attacking the validity of the marriage. 28 ALR 652 and authorities there cited. 35 Am. Jr., Marriage, Section 113, page 251; 55 CJS Marriage, §58a, p. 937."

The evidence revealed defendant to be suffering from a mental illness which was periodic in nature, allowing for lucid intervals. The law is clear that a marriage by a person subject to temporary or periodic insanity contracted during a lucid interval is valid.[1]

[1] *Rawdon v. Rawdon* (1856) 28 Ala. 565; *Hamaker v. Hamaker* (1856) 18 Ill. 137, 65 Am. Dec. 705; *Ward v. Dulaney* (1852) 23 Miss. 410; *Smith v. Smith* (1872) 47 Miss. 211; *M'Adam v. Walker* (1813) 1 Dow, P.C. 148, 3 Eng. Reprint, 654; *Ash's Case* (1702) 2 Freem. Ch. 260, 22 Eng. Reprint, 1196; *Gross v. Gross* (1902) 96 Mo. App. 486, 70 S.W. 393; *Briggs v. Briggs* (1958) 160 Cal. App. 2d 312, 325 P. 2d 219; *Weinberg v. Weinberg* (1938) 255 App. Div. 366, 8 N.Y.S. 2d 341; *Wilson v. Mitchell* (1957) 10 Misc. 2d 559, 169 N.Y.S. 2d 249.

Therefore, the governing issue here is what was defendant's condition at the time of the marriage ceremony, not two months prior thereto, and we believe the court should not have relied on Dr. Deichelmann's opinion as determinative of the issue nor on plaintiff's testimony of what occurred *after* the marriage ceremony, during the honeymoon, as substantiating the doctor's opinion. Such testimony did not fulfill plaintiff's duty of proving by clear evidence defendant's incompetency at the time of the marriage ceremony nor was it sufficient to rebut the presumption of sanity and validity of the marriage. To hold otherwise would be to permit the validity of the marriage ceremony to be assailed by one expert's opinion based on one examination made two months before the ceremony and by plaintiff's uncorroborated testimony of what occurred after the marriage ceremony had taken place. None of this evidence is strong enough to destroy the presumption of validity of the marriage ceremony or the presumption of the defendant's ability to enter into a valid contract of marriage at the time of the ceremony. As was charged by the court in *Nonnemacher v. Nonnemacher,* supra, with Supreme Court approval:

"The real point in issue is whether at the precise time of the marriage the party had sufficient intelligence to understand the nature of the contract and relation into which he was entering. The condition of his mind before and after that time is only important and must only be considered as it tends to show the condition of his mind at the time of the marriage."

The court below ignored the lay testimony to the effect that defendant appeared normal at the time of the marriage ceremony and failed to give consideration to the all-important fact that a religious ceremony was performed after the necessary church pre-marital investigation and interviews. Although the lower court

in its opinion stated, "Defendant acted apparently normal on the day of the wedding . . ." it lost sight of the fact that this was the only day about which we are concerned. It was her competency on that day, and no other, that can concern the court. The court characterizes defendant's appearance of normalcy at her wedding as a "veneer" or "mask" thus attributing to defendant the ability to perform contrary to her feelings, which ability certainly would not be available if she was experiencing one of her psychotic episodes. The court should not have so lightly disregarded the testimony of defendant's appearance of normalcy on her wedding day or the fact that the marriage was a religious ceremony officiated by a priest after due investigation into competency. This evidence strengthens the presumption in favor of the validity of the marriage which presumption is stronger than any presumption that defendant's incompetency continued. In *Wilson v. Mitchell* (1957) 10 Misc. 2d 559, 169 N.Y.S. 2d 249, the husband had been adjudicated insane three months prior to his marriage. It was there held that the presumption of continued insanity was rebutted by evidence of a "remission" a month before the marriage which, while not a cure, represented a return by the incompetent to his normal pre-excitement state and was of a later date than the commitment and appointment of the committee. The court stated a presumption of continuance of the "remission" and nonpsychotic condition arose, which was stronger than the presumption of continued insanity, especially when these conflicting presumptions were further subjected to the strongest of all presumptions affecting a contract of marriage, namely, the presumption favoring the validity of the marriage.

In the case before us, the court in effect placed upon the defendant the burden of extricating herself from the effects of the July 11, 1947 report of Dr.

Deichelmann, whereas, it was the burden of the plaintiff to prove that on September 6, 1947 defendant did not have the capacity to make an intelligent marriage contract.

Just what constitutes sufficient mental capacity to enter into a marriage contract? In *Nonnemacher v. Nonnemacher,* supra, the Supreme Court approved the lower court's charge that: "Not every person can contract a valid marriage. If a person, who was born an idiot, or who, having once been of sound mind, by reason of insanity, or unsoundness of mind, could not comprehend the nature of a marriage contract, were to attempt to contract a marriage and were to go through the ceremony before a minister of marrying a woman, the law would hold such a marriage to be void, because he was not of sufficient capacity to contract. But it is not every mental weakness or eccentricity on the part of one of the contracting parties that will render a marriage void. It might be the case that a man or woman contracted a marriage and it might afterwards be found that the individual was not one of the best balanced men or women, not one of the strongest minded, and perhaps as to some difficult affairs or contracts would not be of sufficient mental ability to act or contract, and yet the individual might have sufficient capacity to contract a marriage, always provided the jury trying the question are satisfied that he or she understood the nature of the obligation he or she was assuming or entering into."

. . .

"Mere weakness of mind and peculiarities of conduct will not invalidate a marriage. The evidence must show that there was such an imbecility or unsoundness of mind at the time that the party did not and could not have an intelligent understanding of the contract and relation of marriage.

"Weakness of memory, peculiarities, mental delusions, short of insanity, or want of capacity to manage a business will not avoid a marriage, if the party had sufficient capacity and intelligence to understand the nature of the contract and relation into which he was entering.

. . .

"If Molton Nonnemacher at the time of the marriage on October 25th had an intelligent understanding of the nature of the act in which he was engaged and the contract and relation into which he was entering, then the marriage is valid, even though he was not capable of making business contracts and carrying on business generally."

In *Parrish et al. v. Parrish,* (Common Pleas Ct. of Allegheny County—1936), 86 P.L.J. 23, it was stated: "In cases of this sort, the question necessarily is whether the party adjudged to be unable, owing to weakness of mind, to care for his estate, had sufficient mentality at the time of the marriage to comprehend the nature and obligation of the marriage contract. One found by inquisition to be under a disability and hence unable to bind his estate by contract may, nevertheless, enter into a valid marriage if he intelligently understands what he is about: Imhoff v. Witmer's Admr., 31 Pa. 243, 245. An adjudication that he is a weak-minded person raises a presumption of incapacity, but it does not prevent inquiry as to his capacity at the time of marriage; it merely places the burden of proof on the party who asserts the marriage was valid: In re Hoffman's Estate, 209 Pa. 357; In re Estate of Mary Griffin, 109 Pa. S.C. 594.

"Viewed in this light, we think the proof offered by respondent shows quite clearly that Parrish thoroughly understood what he was doing when he married. Without discussing the testimony of each witness separately, it is sufficient to say there was proof,

wholly uncontradicted, that Parrish had courted respondent for more than a year previous to the wedding, had gone with her to obtain the license and answered intelligently and correctly all questions put to him by the clerk, had appeared with her before the minister and made proper responses in the marriage ceremony, thereafter had taken respondent to the trust officer before named, introduced her as his wife and made arrangements to procure furniture for their home, had lived with and supported her as his wife for more than two years, had maintained a comfortable home in which his father and mother also resided for a time, and had informed his friends that he was proud of his wife and happy with her,—'happier than he had been for quite a few years'. When, in addition, a number of witnesses testified there was nothing about his conduct to indicate he was mentally unsound, it is patent that he understood and knowingly assumed the conditions, duties and obligations which ensued from his marriage (Nonnemacher v. Nonnemacher, 159 Pa. 634), and that the presumption of incapacity arising from the earlier adjudication has been adequately overcome. It follows that a decree for annulment must be refused."

In *Kuehne v. Kuehne* (1924) 185 Wis. 195, 201 N.W. 506, the court held that while the testimony might justify a finding that the defendant's mind was diseased at the time of the marriage, it fell far short of indicating that it was diseased to the extent that she had no understanding or appreciation of the nature of the marriage contract, especially where the husband himself had had no suspicion that she was insane until she later became ill.

It is most difficult to believe that defendant in this case could have been so incompetent or so mentally ill that she could not validly enter into marriage as claimed by plaintiff and yet such condition not be obvious to him when he had her apply for the marriage

license and go through the marriage ceremony performed after investigation and interview. Her incompetency to enter into a valid marriage does not even appear from a reading of Dr. Deichelmann's report of July 11, 1947, which report, as already quoted, affirms the fact that, despite her mental illness, defendant was well aware of the responsibilities and seriousness of her oncoming marriage and had expressed grave concern and thoughtfulness over whether or not it should take place. Can it truthfully be said that a person who so ponders the wisdom of her oncoming marriage was a person without sufficient mind to understand what a marriage means? The doctor's report also revealed her scruples with regard to pre-marital sexual liberties, which is an indication of her understanding of the physical aspects of the marriage relationship and the attendant responsibilities. The report shows that defendant did conceive and understand the seriousness of the marriage contract and the marriage relationship and was giving that matter great thought and deliberation. In the very early case of *Elzey v. Elzey* (1857) 1 Houst. Del., 308, it was very well reasoned:

"It would be dangerous, perhaps, as well as difficult to prescribe the precise degree of mental vigor, soundness, and capacity essential to the validity of such engagement; which, after all, in many cases, depends more on sentiments of mutual esteem, attachment, and affection, which the weakest may feel as well as the strongest intellects, than on the exercise of a clear, unclouded reason, or sound judgment, or intelligent discernment and discrimination, and in which it differs in a very important respect from all other civil contracts."

Plaintiff's evidence, both expert and non-expert, upon which the court relied as sustaining his burden of proof, concerned itself with facts which did not

rule out defendant's capacity to validly contract a marriage as that capacity has been defined by law. Thus, the evidence had very little probative value on the ultimate issue involved and did not meet plaintiff's burden of proof.

Plaintiff further claimed that the marriage was void by reason of defendant's fraudulent swearing that she was of sound mind when obtaining the marriage license. Even if such false swearing had been proved, it would be immaterial to the validity of an otherwise valid marriage contract. The validity of a marriage is not affected by the fact that the marriage license may have been so fraudulently obtained. In *Johnson v. Johnson* (1943) 214 Minn. 462, 8 N.W. 2d 620, the court, in applying Iowa law, held that the marriage was not affected by the bridegroom's false swearing that he was not under guardianship as an incompetent. In re *Reeves Estate* (1928—Tex. Civil App.), 7 S.W. 2d 683, the court, in applying Kansas law, held that the marriage was not affected by the applicant's false representation that he had never been afflicted with insanity. Pennsylvania law also follows the rule that the marriage licensure act is directory only and not mandatory and therefore a valid marriage can be contracted without such license or pursuant to a defective or improperly obtained license.[1]

We can find no valid reason in law, therefore, to hold the ceremonial marriage contracted by plaintiff and defendant on September 6, 1947 to be null and void.

---

[1] *Miller's Estate* (1907), 34 Pa. Superior Ct. 385; *Hornbake v. Hornbake* (1919), 72 Pa. Superior Ct. 605; *Biesecker's Estate* (1898), 7 Pa. Dist. 70; *Greene v. Brandt* (1930), 13 Pa. D. & C. 712, 78 P.L.J. 732; *Shouey v. Shouey* (1931), 16 Pa. D. & C. 693; *Abbott's Petition* (1935), 27 Pa. D. & C. 205; *Cordora v. Cordora* (1946), 58 Pa. D. & C. 87; *Shaffer v. Harris* (1950), 71 Pa. D. & C. 587.

If the evidence was. such that the law would require us to declare the ceremonial marriage void, we would still be constrained to hold that under the facts and the law of this state a common law marriage exists. In the case of *Langdon v. Langdon* (1932), 183 N.E. 400, the Indiana Supreme Court held the ceremonial marriage void because one of the parties was insane at the time the marriage was contracted in September, 1923, and that being void no subsequent cohabitation could validate it. However, the court found a valid common law marriage existed on the reasoning that the presumption in favor of a legal marriage was much stronger than the presumption of continued insanity of one of the parties, and therefore restoration of the party's sanity was to be presumed. The court thus found cohabitation after restoration of sanity created a valid common law marriage. The court's reasoning was as follows:

"While it is true that after a person is once adjudged insane, or the fact of one's insanity is established, there arises a presumption that such condition continues till the contrary is shown, and until his sanity is established, and such person would during such time be incompetent to effect a valid marriage or to enter into any other valid contract whatsoever, such is the rule where the question involved relates to ordinary business transactions in which the public has no interest. Redden v. Baker (1882) 86 Ind. 191.

"But where the legality of a marriage is involved, as in this case, we are confronted with another presumption, viz., the presumption of the legality of the marriage relation. The question therefore is: Which is the stronger presumption, that of continued insanity of William Langdon for a period of almost five and one-half years, and consequent adultery, or that of restoration of sanity and legitimate cohabitation? If we presume that William Langdon regained his

sanity before his death, and continued to live and cohabit with Grace Langdon as husband and wife, being accepted in society as such, the law will presume a good common-law marriage; the presumption being in favor of morality and not immorality, legitimacy and not bastardy. Boulden v. McIntire (1889) 119 Ind. 574, 21 N.E. 445, 12 Am. St. Rep. 453; Castor v. Davis (1889) 120 Ind. 231, 22 N.E. 110, 111.

"Every intendment of the law is in favor of matrimony. When marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proof, the law raises a strong presumption of its legality; not only casting the burden of proof on the party objecting, but requiring him throughout, and in every particular, plainly to make the fact appear, against the constant pressure of this presumption that it is illegal and void. So that it can not be tried like ordinary questions of fact, which are independent of this sort of presumption. Bishop on M. & D. Vol. 1 (6th Ed.) §457."

The decision in *Langdon,* supra, was predicated upon facts less impressive than the facts before us in this case. Here we do not have to rely on any presumption of restoration of sanity for it is clear from the evidence that defendant did have lucid intervals after the ceremonial marriage in which she could have contracted a valid marriage. That she had such lucid intervals is shown not only by the expert testimony to that effect but also by evidence showing that she was able to perform such tasks as Red Cross work, Gray Lady at the Sacred Heart Hospital in Norristown, Chairlady and Treasurer of the Gray Ladies in Conshohocken. Her lucid intervals were also shown by evidence pointing out that as late as 1952 plaintiff and defendant sought and received medical attention for the purpose of having children; that plaintiff had defendant sign deeds, which he states he would not

have done had he felt her incompetent to do so. He testified that she was the most wonderful wife in the world for most of the time in which they lived together and that she acted strangely only during periodic intervals.

Plaintiff's own evidence of defendant's ability to function properly except for the intervals of strange behavior not only made more difficult his task of proving that defendant was not functioning properly on her wedding day when all witnesses say she appeared normal on that day, but also added support to the legal proposition that his cohabitation with her during such lucid periods established a valid common law marriage even if he had proved her incompetency on the date of marriage. In *Wiley v. Wiley* (1919) 75 Ind. App. 456, 123 N.E. 252, a case involving the validity of a marriage where the husband was insane at the time the ceremonial marriage took place, and remained insane until his death, the court said obiter:

"Should the insane party be restored to sanity, and thereafter the two should live together as husband and wife for a long period of time, under circumstances evincing pure motives and good faith from the beginning, then from their subsequent and continued conduct the presumption may arise that the parties actually entered into a new marriage, which new marriage, although there was no solemnization and no compliance with any of the provisions of the statute relating to the procurement of a license, nevertheless in some cases may be valid at common law."

The applicable law is summarized in 18 Ruling Case Law 436, §64 with the statement that in jurisdictions recognizing common-law marriages, the general rule is that, if parties desire marriage, and do what they can to render their union matrimonial, but one of them is under disability, their cohabitation thus matrimonially meant and continued, after the disability

is removed, will, in law, make them husband and wife from the moment that such disability no longer exists, although there are no special circumstances to indicate that the parties expressly renewed their consent or changed their mode of living after the removal of the impediment.

Pennsylvania does recognize common law marriages: *Caviston v. Lang* (1943), 152 Pa. Superior Ct. 51; *Hornbake v. Hornbake* (1919), 72 Pa. Superior Ct. 605; *Stauffer Estate*, 372 Pa. 537. In the latter case, we quoted from *Buradus v. Gen. Cement Prod. Co.*, 159 Pa. Superior Ct. 501, as follows: "Marriage without civil or religious ceremony (perhaps mistakenly accepted here, as the then common law of England, Cf. Bishop on Marriage, Divorce and Separation, §390 et seq., In re: Roberts' Estate (Wyo.) 133 P. 2d 492) is still valid, under the common law of Pennsylvania. And although, with the ready means of transportation everywhere available, common-law marriage may be an anachronism in the present day—born as it was of the exigencies of pioneer life—we have not presumed to question it as an institution sanctioned by our law." Though no children were born of the marriage, such fact is not crucial to the existence of a common law marriage.

The rule here applied for finding a common law marriage under the facts of this case is to be distinguished from that applied in those cases where the presumption of the continuation of a meretricious relationship prevents a common law marriage resulting from cohabitation after removal of the impediment to the marriage, such as in *Pierce v. Pierce* (1946), 355 Pa. 175; *Estate of Mary F. Hughes*, 98 Pa. Superior Ct. 328.

Since we have determined the marriage contracted by the parties on September 6, 1947 to be valid, and that even if it was not, there would be a valid common

law marriage, we find it necessary to pass upon plaintiff's right to divorce on the grounds of fraud, which divorce the Master had recommended in the alternative and which the court below did not pass upon because it found the marriage void. Plaintiff claimed he was entitled to a decree of divorce on the ground of defendant's fraudulent withholding from him information as to her mental condition. Though the Master found in favor of the plaintiff, our own independent review of the record, which we are compelled to make, leads us to a different conclusion. We need not determine plaintiff's credibility when he claims he did not know of defendant's condition and that it was withheld from him prior to marriage, though he knew of her May, 1947 hospitalization and sent her flowers and telephoned her there and was in Ocean City with her when she had her July, 1947 "spell". Nor do we need determine the sufficiency of plaintiff's testimony as proof of fraud, which proof must be of the actual suppression by defendant of the true facts of her mental condition and thus assumes she was aware of those facts and legally capable of suppression. Nor need we here decide whether the suppression of such facts is fraud entitling plaintiff to a divorce. We find it sufficient instead to hold what clearly appears of record that even if fraud were proved, plaintiff subsequently confirmed the marriage by continuing to cohabit with defendant after knowledge.

Our Divorce Code, Act of May 2, 1929, P.L. 1237 §10(g), amended March 19, 1943, P.L. 21, §1, expressly provides that a divorce can be obtained by the innocent and injured spouse if the other spouse "Shall have procured the marriage by fraud, force, or coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse."

In the case before us, plaintiff continued to cohabit with defendant after he received knowledge of her

condition which would have been as early as 1948 when he, by his own testimony, was informed of Dr. Deichelmann's report of his July 11, 1947 examination and was told by Dr. Miraglia that defendant had been mentally ill and upset. His testimony is as follows: "Q. And there was also testimony to the effect that I think Doctor Miraglia testified to the effect that he did inform you about a year after the marriage of Doctor Deichelmann's letter, that she had been mentally ill and had been an upset person, is that correct? A. Yes. Q. If that were the case, why did you in 1952, after knowing this for a period of three to four years, still intend to have children and want to have children? A. Well, first of all, being a good Catholic, I wanted to try to keep the marriage going, as I still loved her, I married her for better or for worse. And on the strength of knowing that she was mentally sick prior to marriage, I thought by her having children it might correct the situation, even though I was taking a chance that if we had children, the children might be incapacitated the same way. But I was willing to take a chance." We thus find no difficulty in concluding that plaintiff as early as 1948 knew of defendant's condition and continued to cohabit with her thereafter, which cohabitation clearly constitutes a confirmation of the marriage and prevents him from thereafter asserting fraud in order to secure freedom from the bonds of matrimony which he now finds onerous.

We hold, therefore, that under the evidence and the law plaintiff is entitled to neither a decree of annulment nor of divorce.

In view of our determination in this matter, we find it unnecessary to pass upon the other issues raised by defendant as to (1) plaintiff's failure to raise the issue of the validity of the marriage in the original support hearing constituting res judicata; (2) Dr. Deichelmann's testimony being in violation of the

284

Act of June 7, 1907, P.L. 462, §1; and (3) the propriety of the proceedings wherein defendant's competence was determined. Decree reversed.

JACOBS and HOFFMAN, JJ., concur in the result.