J-A01039-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BARBARA ROSMARIN, EXECUTRIX FOR THE ESTATE OF GENE BARCLAY ROSMARIN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| LAKPA YANJI SHERPA | : | |
| Appellee | : | No. 1132 EDA 2017 |

Appeal from the Decree March 3, 2017
in the Court of Common Pleas of Bucks County
Orphans' Court at No.:  2014-E0441

BEFORE:   LAZARUS, J., OTT, J., and PLATT*, J.

DISSENTING MEMORANDUM BY PLATT, J.:          **FILED AUGUST 20, 2018**

I respectfully dissent.  I would not affirm on the basis of the trial court opinion.  I am constrained to conclude that the learned Orphans' Court erred in its interpretation of the applicable law, and abused its discretion by dispositive reliance on self-serving, subjective, and, yes, suspicious testimony.  In several instances, Appellee's testimony (or that of her witnesses) is plainly self-contradictory.  At the same time, the court depreciated the significance of undisputed, disinterested adverse evidence, given at the risk of self-incrimination, favoring Appellant.  In my view, Appellant met her burden to prove that Appellee's marriage to the decedent, Gene Rosmarin, was a sham, should have been annulled, and that Appellee had "unclean hands."  I would reverse the order of the learned Orphans' Court.

_____
*   Retired Senior Judge assigned to the Superior Court.

J-A01039-18

We review the disposition of two competing claims to the estate of Gene Barclay Rosmarin, who died at seventy-one after a household accident in May of 2014. On independent review, I conclude that under well-settled Pennsylvania law, Appellant/Executrix should have prevailed.

Our standard of review of a trial court's grant of an annulment is well settled: "It is this Court's duty to make an independent review of the record and study of the matter and to exercise its independent judgment **upon the whole record**[.]" ***DeMedio v. DeMedio***, 257 A.2d 290, 294 (Pa. Super. 1969) (citation omitted) (emphasis added).

> When we review a decision by a [trial] court, we must accept findings of fact supported by the evidence, for the [trial] court is in a much better position than we are to resolve conflicts in the evidence and issues of credibility. **However, we are not bound to accept findings not supported by the evidence; nor are we bound to accept the [trial] court's inferences from the evidence, or its conclusions of law.**

***In Interest of Miller***, 448 A.2d 25, 27 (Pa. Super. 1982) (citations omitted) (emphasis added).[1]

_____

[1] It bears noting that **Miller**, and several other cases relied on by the Orphans' Court, address the existence of a common-law marriage (based on words invoking a "present intent to marry"), an issue not present in this appeal. In response to **Miller**, the Legislature amended the Marriage Law in 1984. The Legislature prospectively abolished common-law marriages altogether effective January 1, 2005. **See** 23 Pa.C.S.A. § 1103. While these common law marriage cases still contain some surviving basic principles, in general the comparisons of proof required for common law versus ceremonial marriage, especially regarding "the intention to marry," cited by the Orphans' Court in its reasoning, are of severely limited applicability to the issues in this appeal.

- 2 -

Here, preliminarily, I am constrained to conclude that the learned Orphans' Court errs in its belief that ruling on the validity of Respondent's purported marriage infringes on the federal judiciary's exclusive jurisdiction over immigration matters. (*See* Orphans' Court Opinion, 3/07/17, at 12).

The fact that it is a federal crime to enter a marriage for the purpose of evading the immigration laws does not deprive the Orphans' Court of its jurisdiction, and its duty, to determine whether the marriage at issue here is also void or voidable under the law of Pennsylvania. The Orphans' Court's reliance on ***Ruiz v. Unemployment Comp. Bd. of Review***, 911 A.2d 600 (Pa. Commw. 2006) (holding that alien with expired work authorization from United States Bureau of Citizenship and Immigration Services, was not legally available for work, thus ineligible for UC benefits), is plainly misplaced. (***See*** Orphans' Ct. Op., 3/07/17, ***supra*** at 11-12). Even though our sister Court acknowledged that immigration is a matter of exclusive federal jurisdiction, that acknowledgement did not prevent the Commonwealth Court from deciding against Ruiz's eligibility for unemployment compensation under Pennsylvania law. ***See Ruiz***, ***supra*** at 603.

In this appeal, Appellant argues that her ex-husband intentionally kept her as both Executrix and residuary beneficiary in his 1998 will, even though they had previously divorced in 1996, in recompense for the end of their twenty-six year marriage.

Respondent/Appellee Lakpa Sherpa claims against the will, as second wife. She would have this Court accept, as the Orphans' Court by and large did, that she and Gene Rosmarin married out of love in 2008, six years after the seeds of romance were planted during a relatively brief meeting in 2002 when she met Rosmarin, her cousin Chokpa's longtime (since before Rosmarin's divorce in 1996) companion/boyfriend, on their visit to Nepal.

The record of Respondent Lakpa's romance is redolent of red flags. At the time of their first meeting, Rosmarin, born in 1943, was fifty-nine; Lakpa, born in 1974, was twenty-eight. Nevertheless, supposedly nurtured by six years of around-the–world phone calls, (near miraculous in itself, since neither could speak the other's language),[2] we are meant to conclude the acquaintance blossomed into love and marriage despite the language barrier, a thirty-one year disparity in age, and having virtually nothing in common except Chokpa.

Integral to this scenario of long-distance romance is Respondent Lakpa's testimony that Rosmarin fell in love, not only with her but also with her small children. (**See** N.T. Hearing, 7/15/16, at 10-11). In 2008, Rosmarin returned

---

[2] Even in 2016, Lakpa used an interpreter for the entire proceedings in the Orphans' Court. (**See** N.T. Hearing, 7/15/16, at 3; N.T. Hearing, 9/29/16, at 4). The Orphans' Court accepted the proposition that Chokpa facilitated the telephone conversations.

to Kathmandu and Lakpa, for the first time since their initial meeting in 2002. By this time, Lakpa had already been turned down twice for a visa application.

There was no formal engagement. The couple married on September 9, 2008, apparently in a Buddhist ceremony, and registered the marriage with local governmental authorities. At the Orphans' Court hearing, Lakpa presented a marriage certificate as proof.[3] (*See id.* at 11). By then, Rosmarin was sixty-four; Lakpa, thirty-four. After a few days, Rosmarin flew back to the United States.[4] He never returned to Nepal.

Lakpa's odyssey to America was not so quick or easy. Although she was apparently barred from applying for a visa to the USA until she was **ninety-five**, for **previous fraud** (including the transmittal of a forged Nepalese passport), now, with the aid of a New York immigration lawyer, Rosmarin applied for a waiver of ineligibility on behalf of Lakpa. Rosmarin claimed the lack of companionship of his wife had made him depressed and despondent.

In pursuit of the waiver of ineligibility, Rosmarin obtained a letter from his family doctor, claiming that he was lonely, despondent, and in need of

_____

[3] The Orphans' Court accepts without apparent difficulty the authenticity of the Nepalese marriage certificate, even though it is undisputed that Lakpa had been banned from entering the United States for her involvement in a forged Nepalese passport scheme. The English translation of the Nepalese Certificate of Marriage gives the domicile of Rosmarin, who lived in Doylestown, as "New Jersey." (Appellee's Supplemental Reproduced Record, 28(b)).

[4] The parties dispute whether the couple took a short "honeymoon" to Chitwan, a Nepalese resort. The resolution of the disagreement is not necessary for the issues on appeal.

- 5 -

companionship. It is undisputed that Rosmarin lied to his doctor about having made four trips back to visit with Lakpa. As already noted, he never returned to Nepal.

Apparently not disclosed in Rosmarin's complaints to his doctor, he continued to maintain companionship through an ongoing relationship with Chokpa, Lakpa's cousin, including annual cruises and other vacations to locations such as Vancouver, Hawaii, and Alaska. Travel documents confirm that in 2013, the couple (Chokpa and Rosmarin) booked a trip to Alaska. They requested one queen-size bed. (*See* N.T. Hearing, 9/29/16, at 60). Chokpa claims she slept on the couch. (*See id.*).[5]

Back home, Chokpa maintained an apartment in Flemington, New Jersey, where she worked in retail. But there is no dispute that she spent most if not all weekends at Rosmarin's home on Corrigan Road in Doylestown. She was a familiar figure to the neighbors. The travel itinerary for the Alaska trip listed Chokpa's address as Corrigan Road. Chokpa's name appeared along with Rosmarin's on the Corrigan Road utility bills.

In any event, after six years, Lakpa received her waiver, in early 2014. Did she book the first flight to Pennsylvania and run into the awaiting arms of

---

[5] Chokpa testified that although her involvement with Rosmarin began as a romantic/physical relationship, after a few years it became platonic. She maintained that she paid her own way on these trips, but she could not produce cancelled checks, receipts or any other documentary support for her testimony.

Rosmarin?  Not quite.  She flew to New York and immediately moved in with her uncle and several other blood relatives, in Jamaica.

In short order, she found a job in Manhattan, obtained a New York State identification card, and opened her own New York bank account.  Lakpa claimed that for two months, she commuted from Doylestown to Flemington with Rosmarin on his way to work but it turned out that during the time in question Rosmarin was out of work on short-term disability, and did not commute at all.  And what of Lakpa's children, whom Rosmarin fell in love with twelve years earlier?  Lakpa left them in Nepal with her family.

There is more – much more – but the discerning reader may have already perceived a problem.  Perhaps most disturbing is the Orphans' Court's relative disregard for the sworn testimony of Rosmarin's tax preparer, IRS enrolled agent Thomas Carfagno.  He testified under oath before the Register of Wills **and** at the Orphans' Court hearing, that Rosmarin asked him to amend his last four federal tax returns from single to "married – filing separately" because he was helping Lakpa to enter the U.S.

Rosmarin explained to Mr. Carfagno that the marriage was only to help Lakpa enter and become a citizen, and that he planned to divorce her (and marry Chokpa!) when Lakpa obtained citizenship and the process was

complete.[6]  (*See* N.T. Hearing (Register of Wills), 7/11/14, at 14-16; *see also* N.T. Hearing (Orphans' Court), 9/29/16, at 19-26).

Mr. Carfagno could not benefit from this testimony, but his admission against self-interest did put him at personal risk.  Indeed, after the hearing at the Register of Wills, Appellee's counsel, D. Kevin Laughlin, Esq., wrote Mr. Carfagno a letter notifying him of his attempt to get the Orphans' Court to refer Mr. Carfagno to the IRS **and** the Treasury Department for preparing fraudulent tax returns.  (*See* N.T. Hearing (Orphans' Court), 9/29/16, at 31; *see id.* at 28-44).

In any event, the Orphans' Court dismissed the testimony on the grounds that "neither Decedent nor Respondent took any affirmative steps toward obtaining a divorce." (Orphans' Ct. Op., 3/07/17, at 3).

This is immaterial.  Respondent (who was not a party to the conversation in the first place) would have no motive to divorce Rosmarin before she had obtained the desired results: entry into the U.S. **and** citizenship.  For the same reason, Rosmarin would not be motivated to file for divorce until the original objective had been achieved.  The Orphans' Court's observation is technically correct, but its intended inference is no more than unsupported speculation.

---

[6] The Orphans' Court overruled Appellee's hearsay objection on the ground that the statement indicated Rosmarin's state of mind.

Moreover, following the reasoning of the court, if inaction can prove intent, or the lack of it, Rosmarin's lack of any follow up steps to remove his ex-wife as Executrix and residuary beneficiary under his will, would tend to establish that he intended to **keep** his former wife as primary residuary beneficiary as well as Executrix.

Taken in isolation, a trier of fact might be inclined to accept an anomaly in the narrative here or there in recognition of the uncertain course of Cupid's arrows. However, viewing the evidence in its totality, as we must under our standard of review, the endless array of half-truths, inconsistencies, and outright deceptions, and the consequent inferences presented by the Orphans' Court, strain credulity and defy common sense.

Notably, this is not case which depends on the trial court's assessment of Respondent's credibility. There is none. To the contrary, the Orphans' Court candidly conceded that "Respondent was by no means a flawless party[.]" (*Id.* at 15).

On independent review, viewing the evidence in its totality, I would draw the inference that by every objective indication, Lakpa had no intent to set up a married life with Rosmarin. There was no "consistent cohabitation," outside of occasional visits with Chokpa, indeed no particular effort to begin a married life in Doylestown. Appellant met her burden to prove that Respondent Lakpa's marriage to Rosmarin was a sham to evade her immigration problems. Respondent had unclean hands.

In the exercise of the limited jurisdiction conferred on it by statute, it is plain that the Orphans' Court must apply the rules and principles of equity. Thus, the familiar equity maxim he who comes into a court of equity must come with clean hands applies to matters within the Orphans' Court's jurisdiction.

*In re Estate of Pedrick*, 482 A.2d 215, 222 (Pa. 1984) (citations and internal quotation marks omitted). I would conclude that this marriage was a sham which the Orphans' Court should have annulled and that Respondent/Appellee sought equitable relief with unclean hands.

Accordingly, I respectfully dissent.